663 F.2d 1354
 25 Fair Empl.Prac.Cas. 1271,
27 Fair Empl.Prac.Cas. 177,
27 Empl. Prac. Dec. P 32,253
UNITED STATES of America, et al., Plaintiffs-Appellees,
v.
CITY OF CHICAGO, et al., Defendants-Appellees,
v.
FRATERNAL ORDER OF POLICE, etc., et al., Intervening
Defendants-Appellants.
UNITED STATES of America, et al., Plaintiffs-Appellees,
v.
CITY OF CHICAGO, et al., Defendants-Appellees,
v.
Robert W. SUESS, et al., Intervening Defendants-Appellants.
UNITED STATES of America, et al., Plaintiffs-Appellees,
v.
CITY OF CHICAGO, Defendant-Appellant,
v.
FRATERNAL ORDER OF POLICE, etc., et al., Intervening
Defendants-Appellees.
 Nos. 80-2008, 80-2146, 80-2235.
 United States Court of Appeals,
Seventh Circuit.
 Argued En Banc Sept. 10, 1981.
Decided Nov. 2, 1981.
 
 Stanley H. Jakala, Berwyn, Ill., Kendall Griffith, Chicago, Ill., for defendants-appellants.
 Irving Gornstein, Dept. of Justice, Washington, D. C., Valerie A. Leopold, Chicago, Ill., for plaintiffs-appellees.
 Before CUMMINGS, Chief Judge, and PELL, SPRECHER, BAUER, WOOD and CUDAHY, Circuit Judges.
 CUDAHY, Circuit Judge.
 
 
 1
 This consolidated appeal represents the latest phase in the protracted litigation involving the hiring and promotion practices of the Chicago Police Department. In 1976, those practices were found by the district court to have discriminated against blacks, Hispanics and women in violation of Title VII of the Civil Rights Act of 1964, and mandatory quotas for the hiring and promotion of police officers were imposed to remedy the effects of this discrimination. In a previous decision, since vacated, a panel of this court affirmed the district court's denial of a joint motion by the United States and the City of Chicago (the "City") to modify the existing injunctive decree so as to reduce the black and Spanish-surnamed ("minority") promotional quota from 40% to 25% and to establish a 10% promotional quota for women. In addition, the panel affirmed another district court order, which had granted the City permission to make promotions, subject to the mandatory quota, from an eligibility roster the nondiscriminatory character of which had not been definitively tested in an evidentiary hearing. United States v. City of Chicago, 648 F.2d 1110 (7th Cir. 1981). As noted, this decision was vacated pursuant to a majority vote of the circuit judges in regular active service, and this rehearing en banc followed.
 
 
 2
 We conclude that changed circumstances require modification of the 1976 decree as proposed in the joint motion, and hence vacate the order of the district court and remand with instructions to employ a 25% minority quota in future promotions sought by the United States and the City. We also instruct the district court to proceed expeditiously with an evidentiary hearing to consider the validity under Title VII of the procedures used in compiling the current sergeant eligibility roster. We further authorize the district court, at its discretion, to hold promptly an evidentiary hearing to determine whether any further modifications of the minority promotional quotas are indicated on the basis of current conditions. This inquiry may also address the important matter of a promotional quota for women.
 
 I.
 
 3
 Because this appeal involves the effect of changed circumstances since the entry of the original decree by the district court in 1976, it is necessary to set forth at least in outline the history of this litigation. On February 2, 1976, the district court entered its final decree finding the Chicago Police Department guilty of race and sex discrimination in violation of Title VII. United States v. City of Chicago, 411 F.Supp. 218 (N.D.Ill.1976).[1] As part of its final decree, the court imposed mandatory hiring and promotional quotas to remedy the effects of past discrimination. The decree established as a "long term goal" the appointment to the police force of sufficient numbers of qualified blacks, Spanish-surnamed persons and females to increase substantially the minority composition of the Police Department so that it would more nearly reflect the racial and ethnic composition of the City's work force as a whole.[2] To ensure the prompt achievement of this goal, the court ordered that 42% of all future patrol officer vacancies be filled by qualified black and Spanish-surnamed males, and 16% of the vacancies be filled by qualified females, until further order of the court. 411 F.Supp. at 249.
 
 
 4
 With respect to promotion from patrol officer to sergeant, which is the subject of this appeal, the district court's final decree provided:
 
 
 5
 The Chicago defendants shall adopt and seek to achieve a goal of promoting blacks, Spanish-surnamed persons and females to the rank of sergeant so as to have and maintain a sergeant mix reasonably representative of the patrol force, the minority and female percentages of which will begin to increase under the provisions of this decree relating to the appointment of patrol officers.
 
 
 6
 411 F.Supp. at 250 (emphasis supplied). To ensure the attainment of this latter goal, the decree provided that, until further order of the court, 40% of all promotions to sergeant were to consist of black and Spanish-surnamed persons, subject to the availability of qualified applicants.[3] In meeting this goal or quota, the City was authorized to use the eligibility list based on the results of the 1973 sergeant examination, until new selection methods were developed or until minority names on the list were exhausted.
 
 
 7
 On appeal, this court upheld both the finding of unlawful discrimination and the imposition of mandatory quotas. United States v. City of Chicago, 549 F.2d 415 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). In reversing a portion of the district court decree which had allowed the City to disregard existing eligibility rosters as long as the mandatory quotas were met, we held that hiring and promotions were to be made, insofar as possible, from eligibility rosters compiled pursuant to state law.[4] We therefore required that all promotions to sergeant, after filling the 40% minority quota, were to be made in rank order from such an eligibility roster.[5]
 
 
 8
 On August 18, 1976, the City submitted for the approval of the district court a new roster of qualified candidates for appointment to the patrol officer force. This roster was established on the basis of new selection procedures, including a revised patrolman examination given in 1975. The district court found that the results of the new procedures displayed a pattern with respect to race and sex that was not significantly different from that of the pool of applicants. Hence, the court concluded that the use of the new roster did not constitute a prima facie violation of Title VII. United States v. City of Chicago, 420 F.Supp. 733 (N.D.Ill.1976), aff'd, 567 F.2d 730 (7th Cir. 1977), cert. denied, 436 U.S. 932, 98 S.Ct. 2832, 56 L.Ed.2d 777 (1978). A nondiscriminatory hiring procedure thus having been conceived and put into practice, the district court suspended the hiring quotas for minority and female patrol officers contained in the 1976 final decree. Thus, since 1976, the hiring of patrol officers has proceeded without the aid of mandatory quotas.
 
 
 9
 In December 1979, the City, having administered a new examination to patrol officers for promotion to sergeant, posted the list of successful applicants resulting from the new exam.[6] The City expected to make fewer than 400 promotions from this list. Although 26% of the applicants were black or Spanish-surnamed, only 7% of the top 400 in rank belonged in these minorities.[7] These results showed a greater disparity between the proportions of white and minority candidates and white and minority entries found qualified for the rank of sergeant than did the 1973 sergeant examination, which had been declared invalid.[8] Meanwhile, as a result of the operation of the 40% quota imposed in 1976, by early 1980, the racial composition of the sergeant force approached substantial parity with that of the patrol officer force.[9]
 
 
 10
 On June 24, 1980, the United States and the City filed a joint motion for entry of a "consent decree" seeking to reduce the minority quota for promotion of sergeants from 40% to 25%.[10] The motion also sought to establish a 10% promotional quota for women.[11] The district court denied the motion on July 22, 1980, and the City appeals.[12]
 
 
 11
 Immediately following the denial of the joint motion, the City moved for permission to promote sergeants from the 1979 sergeant eligibility roster, subject to the 40% minority quota in the 1976 decree. The Suess intervenors, who represent white male patrol officers ranked in the first 400 of the 1979 roster, moved to stay, or in the alternative to enjoin, the promotions other than in rank order until the validity of the 1979 selection procedures (based on the examination administered at that time) was adjudicated. On July 25, 1980, the district court granted the City's motion to promote and denied the intervenors' motion to stay or enjoin the promotions. The Suess intervenors and the Fraternal Order of Police (FOP) appeal from these rulings.
 
 II.
 
 12
 In denying the joint motion for the entry of a "consent decree," the district judge stated that "no showing has been made to warrant a modification of the (1976) decree."[13] The City argues that the court incorrectly applied the allegedly rigorous standard for the modification of a permanent injunction rather than the less stringent standard governing the approval of settlement agreements.[14] We cannot accept this contention. The district court correctly treated the joint motion as a motion to modify a permanent injunction.[15] The joint motion in the instant case was not a voluntary agreement among the parties settling the dispute prior to an adjudication on the merits. Rather, a decision on the merits had already been rendered and a permanent injunction entered to protect the rights of the victims of the City's unlawful discrimination. The City cannot relieve itself of the burdens of this injunction simply by agreeing with only one party, the United States, to restructure the injunction, especially when the Robinson plaintiffs, representing black patrol officers, oppose the joint motion.
 
 
 13
 Having established the issue as the modification of a permanent injunction, we believe that United States v. Swift & Co., 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), must be the starting point of our discussion.[16] In Swift, the Court recognized the inherent power of a court of equity to modify a decree in light of changed circumstances, "to adapt its restraints to the needs of a new day." 286 U.S. at 113, 52 S.Ct. at 462. Swift involved a consent decree, entered in a suit brought by the United States charging a monopolistic combination in violation of the Sherman Act, which enjoined the defendants from entering certain markets. Ten years after entry of the consent degree, the defendants petitioned the court to modify the injunction so as to allow them to enter the restricted markets. The district court granted the motion but the Supreme Court reversed, announcing the applicable standard as follows:
 
 
 14
 The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.
 
 
 15
 286 U.S. at 119, 52 S.Ct. at 464 (emphasis supplied). The Supreme Court, applying this standard, concluded that the dangers to which the injunction was directed, namely, the opportunity and inclination of the defendants to exploit their dominant market position to starve out weaker rivals, continued "with undiminished force today." 286 U.S. at 115, 52 S.Ct. at 462. Far from becoming "attenuated to a shadow," the "ancient peril" remained very much alive. 286 U.S. at 118, 52 S.Ct. at 463. In short, the conditions that originally prompted the court to award injunctive relief had not changed at all.
 
 
 16
 Although numerous cases have mechanically employed the Swift "grievous wrong" test, thereby suggesting that hardship to the defendant is the sole touchstone for modification of an injunction, see, e. g., De Filippis v. United States, 567 F.2d 341, 342-44 (7th Cir. 1977); SEC v. Advance Growth Capital Corp., 539 F.2d 649, 652 (7th Cir. 1976), the Supreme Court has made it clear that Swift is not amenable to such a narrow interpretation. Thus, in United States v. United Shoe Machinery Corp., 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), the Court held that a district court had "misconceived the thrust" of Swift when it invoked the "grievous wrong" language to deny modification of an injunction entered in an antitrust case. 391 U.S. at 248, 88 S.Ct. at 1499. The "grievous wrong" test, the Supreme Court observed, must be understood in light of the Swift Court's emphasis that the dangers that had led to the initial complaint had not been removed at the time modification was requested. Granted this understanding, the Court summarized the lessons of Swift as follows:
 
 
 17
 Swift teaches that a decree may be changed upon an appropriate showing, and it holds that it may not be changed in the interests of the defendants if the purposes of the litigation as incorporated in the decree (the elimination of monopoly and restrictive practices) have not been fully achieved.
 
 
 18
 391 U.S. at 248, 88 S.Ct. at 1499. In United Shoe, it was the government which sought modification of the original injunction, claiming that additional, more drastic relief was necessary to fulfill the "purposes of the litigation." Because the relief provided in the original injunction had resulted in little progress toward the achievement of the decree's stated objective of restoring workable competition, the Court concluded that modification would promote, not subvert, the "purposes of the litigation." Swift thus posed no barrier to modification. 391 U.S. at 248-49, 88 S.Ct. at 1499-1500.
 
 
 19
 The standard for modification of injunctions that emerges from Swift and United Shoe is thus not based solely on hardship to the enjoined party. The standard also incorporates consideration of whether there remains any need to continue the injunction, that is, whether "the purposes of the litigation as incorporated in the decree" have been achieved.[17]
 
 
 20
 Certainly modification of a permanent injunction is extraordinary relief, and requires a showing of exceptional circumstances, Philadelphia Welfare Rights Organization v. Shapp, 602 F.2d 1114, 1119 (3d Cir. 1979), cert. denied, 444 U.S. 1026, 100 S.Ct. 689, 62 L.Ed.2d 660 (1980); De Filippis v. United States, 567 F.2d 341, 342 (7th Cir. 1977). We believe that such a showing was made in the instant case and that application of the Swift-United Shoe standard fully justifies modification of the 40% promotional quota for minorities. The essential purpose of that quota (parity of minority representation, at a substantial level, between patrol officers and sergeants) has been achieved, and changed conditions have rendered continuance of the quota without modification an inequitable and unnecessary burden on presumably innocent individuals.[18] In addition, the language of the 1976 decree itself provided that the quotas which it established were to be effective only until further order of the court.
 
 
 21
 As the language of the 1976 decree makes evident, the essential function served by the 40% minority promotional quota was to achieve parity with the patrol officer force (with both minority sergeants and minority patrol officers as a substantial percentage of the whole). The district court intended the Chicago Police Department "to have and maintain a sergeant mix reasonably representative of the patrol force." 411 F.Supp. at 250. (Emphasis supplied). We think that this was a reasonable and proper objective under the circumstances, and is an objective that has been achieved in substantial measure.[19] The adoption of the 40% figure for minority promotions was entirely consistent with this objective at a time when minority representation on the sergeant force and patrol officer force was very low and when the two ranks were far from parity. Also at that time, the mandatory quota for patrol officer hiring ensured that the rate of minority promotions would mirror the rate of minority hiring. None of these conditions now exist. Parity has been achieved and the 42% minority hiring quota has been replaced by a nondiscriminatory examination that has yielded an eligibility roster for the patrol force that is only 25.8% minority. Current hiring from the 1975 eligibility roster cannot reasonably be expected to raise minority representation on the patrol officer force above this figure.[20] Under the circumstances, quite different from those prevailing in 1976 when the 40% promotional quota was framed, it would be inequitable to innocent non-minority police officers on the 1979 list (and unnecessary in light of the achievement of parity) to continue to insist that 40% of all promotions go to members of minority groups. Although we do not and will not retreat from the long-run aspiration and objective that the racial composition of the police force as a whole should match that of the City's work force, we think it puts the cart before the horse to maintain a high and inflexible quota for minority promotions while minority hiring proceeds under nondiscriminatory selection procedures (approved by the district court) at a much lower rate. Certainly it is only rational that promotions track changes in the composition of the patrol force. There is no apparent justification for promotional practices to follow a rigid path unrelated to the force as a whole.
 
 
 22
 In deciding whether continuance of the 40% minority promotional quota is equitable, we must be particularly cognizant of the quota's potential unfairness to innocent individuals. Although the Swift decision spoke in terms of the hardship suffered by the enjoined party, in the instant case it is not the enjoined party (the City), but rather the persons on the eligibility roster passed over as a result of the quota who bear the real burden of an unjustifiably high promotional quota. These individuals were not parties to the unlawful acts of discrimination committed by the City. It is true that these individuals have no vested right to rank order selection from a roster derived from an examination that is prima facie discriminatory,[21] but we have an obligation not to impose quotas that are not inescapably justified by present facts. Because we have concluded that continuance of the 40% promotional quota is not justified by these present facts, failure to grant modification would unnecessarily and therefore unjustly defeat the opportunities for promotion of these innocent persons.
 
 
 23
 Having decided that continuance of the 40% promotional quota is unjustified, we conclude that the 25% figure proposed in the joint motion is fully warranted by present conditions. The 25% figure will in time establish parity at a level that corresponds closely to the rate of minority hiring currently produced by nondiscriminatory selection procedures. Whether fortuitously or otherwise, the 25% figure also corrects for the disparate impact of the 1979 sergeant examination: minority applicants for promotion, who constituted approximately 25% of the applicants taking the 1979 sergeant examination, are assured of receiving 25% of the promotions under the modified decree. Thus, we think that under the decree, as presently modified, the essential features of the original decree that protected minorities from the effects of discriminatory promotional practices have been left intact, while at the same time the controlling goal of maintaining parity is preserved.
 
 
 24
 Consequently, we hold that the district court abused its discretion in denying the joint motion to modify the decree to reduce the minority promotional quota from 40% to 25%. We believe that present conditions warrant implementation of a 25% promotional quota for black and Spanish-surnamed patrol officers. We therefore direct the district court to apply the 25% quota with respect to all promotions hereafter made under the terms of the 1976 final decree. Although from some points of view desirable, we believe a remand to the district court to reconsider the joint motion under more general directions would be inappropriate in view of the limited life expectancy of the 1979 sergeant eligibility roster and the delay which a remand for further consideration would require. In addition, we think the modified quota should have prospective effect only, and we so direct the district court.[22] Where hiring and promotional practices have been subject to mandatory quotas for a long time, we are sensitive to the dislocations and defeated expectations that might result from an effort to unscramble the omelet or adjust negatively for affirmative action already taken.
 
 
 25
 Finally, we must note that, like the original decree itself, the 25% minority promotional quota adopted today is subject to relatively easy modification as the facts from time to time warrant in order to vindicate the decree's original objectives. In particular, should the nondiscriminatory hiring practices now in effect (or some judicially approved substitute) begin to produce a patrol officer force more nearly representative of the racial and ethnic composition of the City's work force,[23] the district court should entertain a motion to further modify the decree to assure the maintenance of parity between the patrol officer and sergeant forces, at least until the City has produced a nondiscriminatory method for promoting patrol officers. In the latter event, of course, the decree itself, to the extent it prescribes quotas, may become obsolete.
 
 
 26
 As indicated, we also direct the district court to consider the desirability of an appropriate promotional quota for females, either to be counted separately from the minority quota or, if appropriate, to be "double-counted." The need for, magnitude and form of such a quota we leave to the district court, informed by the principles set forth in this opinion. We also again note that a motion by the United States to establish a 5% female quota is still pending in the district court.
 
 III.
 
 27
 The FOP and Suess intervenors appeal from the July 25, 1980 order of the district court granting the City permission to promote sergeants from the 1979 eligibility roster, subject to the 40% minority promotional quota, and denying the FOP and Suess motions to stay or enjoin the promotions.[24]
 
 
 28
 The FOP and Suess intervenors contend that the mandatory promotional quotas contained in the 1976 final decree cannot apply to promotions from the 1979 eligibility roster until the methods utilized in preparing that roster have been adjudicated invalid under Title VII in a full evidentiary hearing. As no such adjudication has yet been made, they argue, the district court erred when it denied rank order promotions from the 1979 roster. But the FOP and Suess intervenors have misconceived the effect of the 1976 decree. Nothing in the decree limited its impact to the now-stricken 1973 sergeant roster. The promotional quota was imposed in order to remedy past discrimination by the City, and was to remain in effect "until further order of the court." 411 F.Supp. at 252.
 
 
 29
 No showing has been made by any party warranting a complete suspension of the minority promotional quota and resort to rank order selection from the 1979 roster. The record shows that the 1979 examination, from which the eligibility roster is drawn, had a more discriminatory impact than the 1973 examination previously found to be illegal.[25] These results, as the district court recognized, made out a prima facie violation of Title VII, the effect of which was to shift to the City the Burden of proving the job-relatedness of the examination. No effort has been made as yet to validate the 1979 sergeant examination. The situation is quite different from that in 1976, when the district court suspended the minority hiring quota and permitted rank order selection upon a showing that the 1975 patrolman examination did not result in a prima facie violation of Title VII.
 
 
 30
 Thus, when the district court was confronted with the City's uncontested showing of an urgent need for new sergeants,[26] the court had no alternative but to grant the promotions subject to some magnitude of minority quota.[27] Such promotions could only come from the 1979 roster because (1) the earlier 1973 roster had been lawfully stricken, (2) we had instructed the district court to use insofar as possible the rosters compiled pursuant to state law, 549 F.2d at 437-39, and (3) no challenge to the state law validity of the 1979 roster had been interposed. It was therefore appropriate for the district court to make operational use of the 1979 eligibility roster, subject to the mandatory promotional quota, in meeting the City's urgent need for new sergeants.
 
 
 31
 Finally, the FOP and Suess intervenors complain that they made repeated requests for an evidentiary hearing on the Title VII validity of the 1979 sergeant roster and that such requests were improperly rejected by the district judge. They insist that they were willing and able to establish the validity of the roster at such a hearing. Our examination of the record indicates that the district judge made sufficiently clear his willingness to go forward with an evidentiary hearing once one of the parties submitted a pleading alleging the validity of the 1979 examination.[28] In order to eliminate any doubt on this score, however, we instruct the district court on remand to proceed expeditiously with an evidentiary hearing at which the City or the FOP and Suess intervenors may come forward with any evidence they can marshal to establish that the 1979 sergeant eligibility roster does not violate Title VII. Other parties may, of course, adduce evidence to the contrary.IV.
 
 
 32
 In general, we deplore the need to intrude into the affairs of the Chicago Police Department through the use of mandatory quotas, which may obstruct to some degree the praiseworthy process of recognizing individual merit by suitable promotion. But we deplore even more the history of racial discrimination, the results of which Judge Marshall and others have done much to rectify during recent years. A police force stained by discrimination-past or present-cannot be effective if discrimination renders it in any sense and to any degree an alien body, not fairly representative of the body politic. The composition and operation of an effective police force should be in as complete harmony as possible with the community from which it springs. Nonetheless, to try to expunge prejudice and achieve justice and harmony by the blunt instrument of mandatory quotas administered by the courts is far from ideal. Hence, when we use such an instrument, we must seek to use it only with the utmost fairness and rationality, and we anticipate the day when its use can be properly supplanted by a fair and nondiscriminatory system of individual merit selection.
 
 
 33
 Accordingly, we vacate the orders of the district court and remand for further proceedings consistent with this opinion.
 
 
 34
 SPRECHER, Circuit Judge, dissenting.
 
 
 35
 I respectfully dissent and would affirm the orders of the district court appealed from for the reasons set forth in the original panel decision formerly reported at 648 F.2d 1110 (7th Cir. 1981) and appended hereto.
 
 APPENDIX
 
 36
 Before FAIRCHILD, Chief Judge, and SPRECHER and CUDAHY, Circuit Judges.
 
 
 37
 FAIRCHILD, Chief Judge.
 
 
 38
 In 1976, following extensive evidentiary hearings, the Chicago Police Department was found guilty of race and sex discrimination in the hiring and promotion of police officers, in violation of Title VII of the Civil Rights Act of 1964. As part of its final decree entered February 2, 1976, the district court ordered that forty percent of the police officers promoted to sergeant be black or Spanish-surnamed. The standard was to remain in effect until further order of the district court.[1]
 
 
 39
 This court affirmed the district court's imposition of a mandatory quota for the promotion of police officers, stating:
 
 
 40
 The district court had a duty to construct a remedy that would both eradicate as far as possible the past effects of discrimination and prevent discrimination in the future. Moreover, even though Title VII did not become applicable to the City until 1972, the court had an obligation to correct the present consequences of discriminatory conduct that occurred before that date.
 
 
 41
 United States v. City of Chicago, 549 F.2d 415, 436 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977) (cites omitted). Such promotions were to be made, insofar as possible, from the eligibility rosters developed by the City pursuant to the Illinois Municipal Code. Ill.Rev.Stat. ch. 24, §§ 10-1-12, 10-1-13, 10-1-14.[2] We held that the City has an affirmative obligation to develop new tests, within the constraint of state law, that do not produce illegally discriminatory results. 549 F.2d at 438.
 
 
 42
 In December, 1979, the City posted the results of its new sergeant selection procedures. The City expected to make fewer than 400 promotions from this list. Although 26% of the applicants were members of a minority group only 7% of the top 400 in rank were such members.[3] These results show a greater disparity between white and minority candidates than did the 1973 promotional exam declared invalid.[4] Based on these results, the 1979 selection procedure is prima facie discriminatory. E.g., United States v. City of Chicago, supra, 549 F.2d at 427.[5] It has not been yet been validated.
 
 
 43
 By early 1980, the racial composition of the sergeant rank approached substantial parity with that of the patrol officer rank.[6] The rate was less than half that of the long term goal established by the final decree, which called for the police department "to more nearly reflect the racial and ethnic composition of the work force of the City of Chicago." 411 F.Supp. at 249.[7]
 
 
 44
 On June 24, 1980, the United States and the City of Chicago filed a joint motion for the entry of a "consent" decree seeking to lower the minority interim goal for the promotion of sergeants from 40% to 25%.[8] This motion also sought to establish a 10% goal for women.[9] The motion was opposed by the Fraternal Order of Police (FOP) and the Suess intervenors, who represent white male patrol officers ranked in the first 400 of the 1979 roster, but whose promotion would be jeopardized by the continuation of the 60%-40% promotional quota. FOP and the Suess intervenors argued for promotions to be made in rank order unless the 1979 list was found to violate Title VII. The Robinson plaintiffs, representing black police officers who first filed suit against the City in 1970, United States v. City of Chicago, supra, 549 F.2d at 421, opposed the motion, arguing that such a modification ignored the actual goal of the 1976 decree, which was parity with the Chicago workforce. The district court denied the joint motion on July 22, 1980, and the City appeals from that denial.[10]
 
 
 45
 The City, immediately following the district court's denial of the joint motion, moved for permission to promote sergeants from the 1979 eligibility roster, subject to the 60-40 ratio in the 1976 decree. The Suess intervenors moved to stay or in the alternative to enjoin promotions other than in rank order until the validity of the 1979 selection procedures is adjudicated. The district court denied that motion on July 25, 1980, and granted the City permission to promote. The Suess intervenors and FOP appeal the district court's order granting Chicago's motion to promote and its order denying the Suess motion to stay or enjoin promotions.
 
 
 46
 For the reasons hereinafter stated, we affirm the district court's decisions which denied the joint motion to modify the 1976 decree, allowed the City to promote and denied the motions by the Suess intervenors.
 
 I.
 
 47
 In denying the joint motion for the entry of a "consent" decree, Judge Marshall stated that "no showing has been made to warrant a modification of the (1976) decree."[11] The City argues that the court incorrectly applied the standard for the modification of an injunction rather than the lesser standard governing the approval of settlement agreements[12] in rejecting the joint motion. Although it does not appeal the court's denial, the United States urges that the court's articulated rationale was insufficient in that it only considered the adverse impact of the 1979 roster rather than whether the new parity between minority officers and sergeants was a sufficient change of circumstances to warrant modification of the 1976 decree. It would have us remand with directions to the district court to set forth its findings and conclusions following reconsideration of the motion to modify. We decline to follow the suggestions of either the City or the United States.
 
 
 48
 The district court correctly treated the joint motion as a motion to modify a permanent injunction rather than as a consent decree.[13] This is not a situation in which the parties to an action have entered into a voluntary agreement settling a dispute, prior to an adjudication of the merits. Here, there was a determination of the merits. A permanent injunction protecting the rights of those the City discriminated against was entered and affirmed. The City cannot avoid this permanent injunction simply by agreeing with only one party, the United States, to a restructuring of that injunction, especially when the Robinson plaintiffs oppose the purported consent decree.[14]
 
 
 49
 Parties seeking to modify a permanent injunction, such as the 1976 decree, bear a heavy burden. As Justice Cardozo stated in denying a modification of a 12 year old anti-trust decree:
 
 
 50
 The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off of the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned.... What was then solemnly adjudged as a final composition of a historic litigation will not be lightly undone at the suit of the offenders, and the composition held for nothing.
 
 
 51
 United States v. Swift & Co., 286 U.S. 106, 119-20, 52 S.Ct. 460, 464, 76 L.Ed. 999 (1932). Accord, SEC v. Advance Growth Capital Corp., 539 F.2d 649, 652 (7th Cir. 1976).
 
 
 52
 The only evidence introduced by the City and the United States in support of their joint motion was the affidavit of a United States Justice Department Attorney, Cynthia Drabek. This affidavit indicated that, at the present time, approximately the same percentage of minorities are sergeants as are patrol officers-21%. See note 6, supra. We cannot say that Judge Marshall abused his discretion in finding that this evidence does not warrant modification of the 1976 decree. United States v. City of Chicago, supra. 549 F.2d at 436.
 
 
 53
 First of all, the permanent injunction entered in 1976 and affirmed in 1977 called not only for parity between the patrol officers and sergeants but between the police force and the City workforce as a whole. 411 F.Supp. at 249. Stating that the injunction's goal is fulfilled now that there is parity between minority officers and sergeants ignores its ultimate goal. Parity between the minority officers and sergeants does not mean that the Chicago police force "reflects the racial and ethnic composition of the work force of the City of Chicago as a whole." Id.
 
 
 54
 Second, substituting as a goal for minority sergeants the percentage of minority officers in the police force is an implicit assertion that having a greater percentage of minority sergeants than officers inflicts a wrong or hardship on the police force or the City of Chicago as a whole. The remedy imposed in the 1976 decree was meant to eliminate the effects of past discrimination in the Chicago Police Force. For the courts to suspend the remedy before the decree's goals are fully met in favor of a policy of half-way parity would strike a serious blow to Title VII itself. See Franks v. Bowman Transportation Co., 424 U.S. 747, 763-64, 96 S.Ct. 1251, 1263-1264, 47 L.Ed.2d 444 (1976).
 
 
 55
 Finally, the joint motion proposed to count black and Hispanic females toward the goals for both minority and female sergeants. See note 9, supra. Yet as Judge Marshall pointed out in denying the joint motion, "(t)he discrimination of the City of Chicago impacted upon three discrete groups-black males, Hispanic males and females."[15] The double counting proposed in the joint motion would dilute the relief granted black and Hispanic males.
 
 
 56
 We do not disagree with the proposition that a goal for the promotion of female police officers should be established now that women are entering the police force in significant numbers.[16] We think Judge Marshall was within his discretion, however, in declining to adopt the joint motion's proposal for the imposition of a goal of 10% female sergeants when only 31/2%-4% of patrol officers are females.[17]
 
 II.
 
 57
 Following the district court's denial of the joint motion to modify, the City moved, on July 24, 1980, for permission to promote sergeants from the 1979 eligibility roster, subject to the 60-40 ratio established by the 1976 decree.[18] The Suess intervenors and FOP opposed the City's motion to promote and moved to stay the promotion. In the alternative, they moved to enjoin all promotions from the 1979 roster in any manner other than that prescribed by the applicable Illinois statutes and Chicago ordinances, until the validity of the 1979 selection procedures would be adjudicated.[19] On July 25, 1980, the district court granted the City's motion to promote and refused to stay or enjoin the promotions as urged by the Suess intervenors and FOP.[20] Suess and FOP appeal both the order allowing the City to promote and the order denying their motion to stay or enjoin.[21]
 
 
 58
 Appellants FOP and Suess essentially ask this court to enjoin the promotion of sergeants pursuant to the 1976 permanent injunction pending a hearing on the validity of the 1979 sergeant's examination. Yet, as Judge Marshall pointed out in denying the motion to stay, or in the alternative to enjoin, the City needed supervisory officers[22] and no one made any effort to contradict that showing.
 
 
 59
 Appellants FOP and Suess appear to argue that the quotas imposed in the 1976 decree apply only to promotions made from the 1973 roster.[23] They do not. Nothing in the decree limited its effect to the 1973 roster. The promotional quotas were imposed in order to remedy past discrimination by the City. United States v. City of Chicago, supra, 549 F.2d at 436. These quotas are to remain in effect until further order of the district court. 411 F.Supp. at 252. No party, including appellants, made any showing to warrant modification or suspension of the 1976 decree. Thus, Judge Marshall did not abuse his discretion when he refused appellants' request to, in effect, suspend the decree.
 
 
 60
 Neither did any party show that the new examinations, from which the 1979 sergeant eligibility roster was derived, were non-discriminatory. Indeed, an affidavit submitted by the United States showed that the 1979 examinations had more of a discriminatory impact than the 1973 examinations previously found to be illegal. See notes 3, 4 and 5, supra.[24] Given the results of the 1979 examination, which state a prima facie case of discrimination, e. g., United States v. City of Chicago, supra, 549 F.2d at 427, Judge Marshall had no choice but to apply the 60-40 ratio to the 1979 list. This situation is quite different from that in 1976, when Judge Marshall suspended the hiring ratios for patrol officers after finding the new 1975 patrol officer examination to be non-discriminatory. Id. at 436 n. 29.
 
 
 61
 Appellants cannot complain that Judge Marshall has not given them the opportunity to litigate the validity of the 1979 exam. In the very order denying the Suess motion, he authorized the commencement of discovery on issues regarding the validity of the 1979 examination. We agree with Judge Marshall's statement that if all the Suess intervenors and FOP wanted was an opportunity to prove the validity of the 1979 examination, they "didn't need to spend the time and the money and the resources of the Court of Appeals to get it."[25]
 
 
 62
 Accordingly, the orders of the district court appealed from are hereby AFFIRMED.
 
 
 63
 CUDAHY, Circuit Judge, concurring in part and dissenting in part:
 
 
 64
 I fully agree that promotion to police sergeant in rank order from the presumptively discriminatory 1979 list would be unjustified. But, unlike the majority, I believe the district court should have granted the joint motion of the United States and the City of Chicago to modify the 1976 decree with respect to the quota for promotion of minority male police officers in the light of changed conditions.[1]
 
 
 65
 Quotas are quite extraordinary measures-not to be applied in ways not wholly and inescapably justified by present conditions. The simple fact is that the mandatory 60-40 quota for hiring of police officers has been abandoned. In 1976 the district court approved a nondiscriminatory examination for the hiring of police officers. United States v. City of Chicago, 420 F.Supp. 733, 737 (N.D.Ill.1976). The 1975 test resulted in a roster of qualified candidates that was 25.8% minority. The police officer force is now about 21% black and Spanish surnamed. Current hiring based on the 1975 police officer's examination cannot raise this percentage above 25%. At the same time, the percentage of minority sergeants (aided by the 60-40 promotion ratio) has also reached 21%. This condition of parity is entirely different from the circumstances prevailing in 1976 when the 60-40 sergeant promotional quota was set. In light of these changed conditions, the United States and the City of Chicago were well advised in moving to modify the quota for minority male promotions to 25%.
 
 
 66
 A reasonable and proper objective for minority sergeant promotions, as indicated by Judge Marshall in the memorandum decision imposing a promotional quota, United States v. City of Chicago, 411 F.Supp. 218, 243 (N.D.Ill.1976),[2] should be to reach parity with the officer force. It may well be, as the majority points out, that the composition of the police force as a whole should, in the long run, match that of the City's work force. See United States v. City of Chicago, 411 F.Supp. 218, 249 (N.D.Ill.1976). But, at present, the police rank, and file are being hired under a nondiscriminatory examination with the approval of the district court and with recourse to no quota at all at a rate below 25%.[3] There is no basis in law or policy-or simple equity-for a promotion quota far in excess of that percentage.
 
 
 67
 Quotas are remedies of last resort-fraught with difficulty and the potential of unfairness to innocent individuals. We do no service to their (sometimes inescapable) use when we apply them irrationally and arbitrarily. The majority suggests that an adjustment of the quota is an "implicit assertion that having a greater percentage of minority sergeants than officers inflicts a wrong or hardship on the police force or the City of Chicago as a whole."[4] I make no such assertion-explicit or implicit-I merely suggest that any quota for promotion not firmly anchored in the most relevant facts (here the racial and ethnic composition of the rank and file) generates an odor of illegitimacy and unfairness which could eventually poison the crucial work of affirmative action in achieving racial justice.
 
 
 68
 Therefore, I respectfully dissent to the extent indicated.
 
 
 
 [1]
 Specifically, the court ruled that the 1971 patrolman examination and the 1973 sergeant examination, upon which hiring and promotion eligibility rosters were based, had a disproportionate impact on blacks, Hispanics and women, and were not shown to be job-related under the Supreme Court's decisions in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) and Albemarle Paper Co. v. Moody, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). 411 F.Supp. at 229-43
 
 
 [2]
 1970 Census data indicated that the male population of Chicago was 32.1% black and 7% Spanish, while the male labor force was 25.8% black and 7.2% Spanish. 411 F.Supp. at 233
 
 
 [3]
 An appropriate goal for the promotion of females would be considered, according to the court's decree, when a sufficient number of females became available for promotion from the patrol officer ranks. 411 F.Supp. at 251
 
 
 [4]
 The Illinois Municipal Code provides that only persons who pass a qualifying exam for a position covered by the code may be placed on the eligibility roster for hiring and that hiring must be from the eligibility roster in rank order. Promotions to any position covered by the code are limited to the top three candidates on the relevant promotional eligibility roster. Ill.Rev.Stat., ch. 24, §§ 10-1-12, 10-1-13, 10-1-14 (1980)
 
 
 [5]
 Moreover, we observed in a footnote that the language in the final decree subjecting the quotas to the availability of "qualified" minority applicants presumably directed the City to fill its minority quotas from the applicable eligibility roster. 549 F.2d at 439 n.35. Thus, we interpreted the decree to require the City to hire and promote from such rosters to the extent possible
 
 
 [6]
 The district court approved the City's plan to strike the 1973 sergeant eligibility roster on June 23, 1978, a decision that was eventually upheld by this court. United States v. City of Chicago, 631 F.2d 469 (7th Cir. 1980)
 
 
 [7]
 The numbers and percentages by race or national origin and by sex who applied, who passed the test and thereby achieved places on the new list, and who placed in the first 400 on that list were as follows:
 Applied for List Total List 1st 400 on List
 # % # % # %
 ---------- ----------- --------- ---------- -------- ----------
White 3156 73.17 2658 78.85 365 91.25
Black 982 22.77 587 17.41 21 5.25
Hispanic 153 3.55 106 3.14 7 1.75
Male 4172 96.76 3231 95.85 391 97.75
Female 191 4.43 140 4.15 9 2.25
Drabek Affidavit, filed April 10,1980, p. 3 (hereinafter "Drabek Affidavit").
 
 
 [8]
 This deviation was even more marked with respect to the first 400 places on the resulting lists. The following table compares by race and ethnic origin the percentages of all applicants who made the first 400 positions on the 1973 and 1979 sergeant eligibility lists, respectively. The table also sets forth the results of an application of the "80% rule" provided for by Section 4(d) of the Uniform Guidelines on Employee Selection Procedures, 43 Fed.Reg. 38,290 at 38,297-98 (1978). This rule provides that the failure of a sex, race or ethnic group to have a success rate which is at least 80% of the rate of the most successful group is considered evidence of adverse impact. Because women generally were not eligible for promotion to sergeant in 1973, there were no meaningful data for women in connection with the 1973 list. Therefore, the following table contains only 1979 data for women
 Percentages of Applicants making 1st 400
 -----------------------------------------
 1973 List 1979 List
 Rate 80% Rule* Rate 80% Rule*
 ---- ---------- ---- ----------
White 7.1 11.6
Black 1.8 25.4 2.1 18.1
Hispanic 7.1 100.0 4.6 40.0
Male 9.4
Female 4.7 50.3
 *The figures in this column represent the percentage of minorities achieving the same success rate as the non-minority candidates.
 Drabek Affidavit supra n. 7, at 4.
 
 
 [9]
 Drabek Affidavit, supra note 7, at 2. The complete statistical breakdown of the Chicago Police Force as quoted in the Drabek Affidavit, is as follows:
 
 
 [3]
 On March 19, 1980, Dr. Pounian and Ms. Cole provided me with a two page computer print-out setting forth separately the current numbers of persons by race and sex within the Patrol Force and the rank of Sergeant in the City of Chicago Police Department. A copy of that print-out ... reflects the following data:
 Total W/M B/M H/M W/F B/F H/F
 ----- ------ ------ ----- ----- ----- -----
Sergeants 1136 889 217 26 1
 (78.3) (19.1) (2.3) (0.1)
Patrol Officers 9778 7442 1723 259 205 122 12
 (76.1) (17.6) (2.6) (2.1) (1.2) (0.1)
 The above figures are close to the following, which were contained in the latest report to the Court filed by the defendants, City of Chicago, et al., on September 14, 1979:
 Total W/M B/M H/M W/F B/F H/F
 ----- ------ ------ ----- ----- ----- -----
Sergeants 1229 963 229 31 1
 (78.4) (18.6) (2.5) (0.1)
Patrol Officers 11286 8116 1944 254 279 145 13
 (71.9) (17.2) (2.3) (2.5) (1.3) (0.1)
Id.
 
 
 [10]
 Although labelled a "consent decree," the joint motion cannot be treated as such because the Robinson plaintiffs, original plaintiffs in the suit, have opposed the joint motion
 
 
 [11]
 With respect to the operational use of the 1979 sergeant eligibility list, the motion provides:
 B. 1. Of the promotions made from the list, 25% shall consist of black and Hispanic persons, subject to their availability on the eligibility list.
 
 
 [2]
 Of promotions made from the list, 10% shall consist of females, subject to their availability on the eligibility list
 
 
 [3]
 Black and Hispanic females promoted to Sergeant in accordance with paragraph 1(B)(2) above shall also be counted, without regard to their sex, in meeting the defendants' obligations under paragraph 1(B)(1) above
 
 
 [12]
 The United States did not join in the appeal, but does argue that the district court provided inadequate justification for its action in denying the joint motion
 
 
 [13]
 Tr. of proceedings at p. 16, July 22, 1980
 
 
 [14]
 See, e. g., Metropolitan Housing Development Corp. v. Village of Arlington Heights, 616 F.2d 1006, 1014 (7th Cir. 1980), where we stated that the court in approving a settlement "need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties."
 
 
 [15]
 We therefore have jurisdiction over the City's appeal pursuant to 28 U.S.C. § 1292(a)(1) (1976), which confers on us jurisdiction to hear appeals from orders "refusing to ... modify injunctions." See Carson v. American Brands, Inc., 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1980)
 
 
 [16]
 The Swift decision has been codified in the Federal Rules of Civil Procedure. Rule 60(b)(5) provides that a court may relieve a party from a final judgment, order or proceeding when "it is no longer equitable that the judgment should have prospective application." See De Filippis v. United States, 567 F.2d 341, 342-44 (7th Cir. 1977)
 
 
 [17]
 See 11 C. Wright & A. Miller, Federal Practice and Procedure § 2961, at 602 (1973): "(A) recent Supreme Court decision (United Shoe ) has said that the thrust of the Swift test is based not so much on the harm being suffered by the enjoined party as on the continuing need for the injunction." (Emphasis supplied)
 
 
 [18]
 As to the quota for women, however, we believe that the district court acted within its discretion in rejecting the proposed 10% promotional quota (under which racial and ethnic minority women would be "double-counted" to help fill both the black and Spanish-surnamed and the female quotas). The district court should, however, in the proper exercise of its discretion, now consider for adoption a suitable quota more nearly reflecting the current female composition of the patrol force. We note that on July 25, 1980, the United States moved to modify the 1976 decree to provide that 5% of the officers promoted to sergeant be female. That motion is apparently still pending before the district court
 
 
 [19]
 Blacks and Hispanics now represent approximately 21.5% of both the patrol officer and sergeant forces. See supra note 9
 
 
 [20]
 The current nondiscriminatory patrolman examination can be expected to result in the hiring of minority patrol officers at a rate close to their application rate. This application rate has, in previously administered examinations, fallen far short of the 40% level. Minority candidates represented only 33% of those taking the 1971 examination and only 28.6% of those taking the 1975 examination. United States v. City of Chicago, 420 F.Supp. 733, 736 (N.D.Ill.1976), aff'd, 567 F.2d 730 (7th Cir. 1977), cert. denied, 436 U.S. 932, 98 S.Ct. 2832, 56 L.Ed.2d 777 (1978); United States v. City of Chicago, 385 F.Supp. 543, 549 (N.D.Ill.1974). Thus, as long as minority groups continue to apply to the police force at rates considerably below their representation in the City's work force, the source of the 40% quota, minority representation on the patrol officer force cannot be expected to reach the 1976 decree's "long term goal" of 40%
 
 
 [21]
 See Part II, infra
 
 
 [22]
 At oral argument, the City expressed a preference for this approach
 
 
 [23]
 The City informed us at oral argument that a new patrolman examination will soon be administered, and that 45% of those who have applied to take the examination are members of racial and ethnic minority groups (minorities and females together represent 63% of those applying to take the exam). Because we do not now know how many of these applicants will actually sit for the examination, nor what the results of the examination will be, we are in no position to judge whether these facts cast doubt on the 25% promotional quota adopted by us today. On remand, the district court in its discretion may inquire into these facts in adjusting the promotional quota after an evidentiary hearing to provide the factual predicate for maintaining approximate parity between the patrol officer and sergeant forces (with appropriate modification, if indicated, for clearly foreseeable events likely to occur in the relatively near future)
 
 
 [24]
 Because the FOP and Suess intervenors appeal from the denial of a motion to enjoin the promotions, this court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1292(a)(1) (1976)
 
 
 [25]
 See supra note 8
 
 
 [26]
 Tr. of proceedings at pp. 14-15, July 25, 1980
 
 
 [27]
 As we have shown in Part II, supra, the minority promotional quota should have been reduced from 40% to 25%
 
 
 [28]
 Tr. of proceedings at p. 10, July 24, 1980; Tr. of proceedings at pp. 29-30, August 27, 1980
 
 
 [1]
 The district court's decision is reported at United States v. City of Chicago, 411 F.Supp. 218 (D.C.N.D.Ill.1976). The court also imposed a mandatory quota for the hiring of police officers, but suspended that portion of the order on September 7, 1976, after the City developed a new roster of candidates derived from an examination given in 1975, which did not have a discriminatory impact. 420 F.Supp. 733, 735 (D.C.N.D.Ill.1976); 437 F.Supp. 256 (D.C.N.D.Ill.1977); United States v. City of Chicago, 549 F.2d 415, 436, n. 29 (7th Cir.), cert. denied, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977)
 
 
 [2]
 The code states that only persons who pass a qualifying examination for a position covered by the code may be placed on the eligibility roster for hiring and that hiring must be from the eligibility roster in rank order. Of course, strict compliance with the Code was impossible under the Supremacy Clause because the 1973 sergeant's roster developed by the City had been found to violate Title VII. Thus, promotions were to be made from the 1973 roster only until the quotas were met and only until other selection methods were developed. See United States v. City of Chicago, 549 F.2d at 438; 411 F.Supp. at 250
 
 
 [3]
 The numbers and percentages by race or national origin and by sex who applied, who passed the test and thereby achieved places on the new list, and who placed in the first 400 on that list were as follows:
 Applied for List Total List 1st 400 on List
 # % # % # %
 ---------- ----------- --------- ---------- --------- ----------
White 3156 73.17 2658 78.85 365 91.25
Black 982 22.77 587 17.41 21 5.25
Hispanic 153 3.55 106 3.14 7 1.75
Male 4172 96.76 3231 95.85 391 97.75
Female 191 4.43 140 4.15 9 2.25
Drabek Affidavit, filed April 10, 1980, P. 3 (hereinafter "Drabek Affidavit").
 
 
 [4]
 This was especially so with regard to the first 400 places on the resulting lists. The following table compares by race and national origin the percentages of all applicants who made the first 400 positions on the 1973 and 1979 Sergeants' Eligibility Lists. The table also sets forth the results of an application of the "80% rule" provided for by Section 4(d) of the Uniform Guidelines on Employee Selection Procedures (1978), 43 Fed.Reg. 38290 at 38297-98. This rule states that the failure of a sex, race or ethnic group to have a success rate which is at least 80% of the rate of the most successful group is considered evidence of adverse impact. Because women generally were not eligible for promotion to Sergeant in 1973, there were no meaningful data for women in connection with the 1973 list. Therefore, the following table contains only 1979 data for women
 Percentages of Applicants making 1st 400
 -----------------------------------------
 1973 List 1979 List
 Rate 80% Rule * Rate 80% Rule *
 ------------- -------------- -------------- ---------------
White 7.1 11.6
Black 1.8 25.4 2.1 18.1
Hispanic 7.1 100.0 4.6 40.0
Male 9.4
Female 4.7 50.3
 
 
 *
 This figure represents the percentage of minorities achieving the same success rate as the non-minority candidates
 
 
 [5]
 Promotion in rank order from the 1979 list is prima facie discriminatory. Permitting promotion from that list, but applying quotas so as to pass over higher ranking non-minority candidates in favor of minority candidates on the list is at least a means of avoiding the discriminatory impact of the 1979 list
 
 
 [6]
 Drabek Affidavit, supra note 3 at p. 2. The complete statistical breakdown of the Chicago Police Force is as follows:
 
 
 [3]
 On March 19, 1980, Dr. Pounian and Ms. Cole provided me with a two page computer print-out setting forth separately the current numbers of persons by race and sex within the Patrol Force and the rank of Sergeant in the City of Chicago Police Department. A copy of that print-out ... reflects the following data:
 Total W/M B/M H/M W/F B/F H/F
 ----- ------ ------ ----- ----- ----- -----
Sergeants 1136 889 217 26 1
 (78.3) (19.1) (2.3) (0.1)
Patrol Officers 9778 7442 1723 259 205 122 12
 (76.1) (17.6) (2.6) (2.1) (1.2) (0.1)
 The above figures are close to the following, which were contained in the latest report to the Court filed by the defendants, City of Chicago, et al., on September 14, 1979:
 Total W/M B/M H/M W/F B/F H/F
Sergeants 1229 963 229 31 1
 (78.4) (18.6) (2.5) (0.1)
Patrol Officers 11286 8116 1944 254 279 145 13
 (71.9) (17.2) (2.3) (2.5) (1.3) (0.1)
Id.
 
 
 [7]
 The final figures of the 1980 census show that 50.4% of the City of Chicago's total population of 3,005,072 are non-white. (This percentage figure includes Blacks, Aleutians, Eskimos, American Indians, Asian and Pacific Islanders, and Other.) 14% of the City's population classified itself as Spanish Origin. 1980 figures on the make-up of Chicago's workforce will not be available until 1982. U. S. Bureau of the Census
 
 
 [8]
 Although the United States and the City of Chicago termed their joint motion a "consent" decree, it cannot be treated as such because the Robinson plaintiffs, original plaintiffs to the suit, opposed the purported decree
 
 
 [9]
 With respect to the operational use of the 1979 Sergeants' Eligibility List, the motion provides:
 B. 1. Of the promotions made from the list, 25% shall consist of black and Hispanic persons, subject to their availability on the eligibility list.
 
 
 [2]
 Of promotions made from the list, 10% shall consist of females, subject to their availability on the eligibility list
 
 
 [3]
 Black and Hispanic females promoted to Sergeant in accordance with paragraph 1(B)(2) above shall also be counted, without regard to their sex, in meeting the defendants' obligations under paragraph 1(B)(1) above
 
 
 [10]
 The United States, a party to the joint motion, does not appeal from that denial, but does argue that the district court provided inadequate justification for its action
 FOP and the Suess intervenors have moved in this court to dismiss the City's appeal, arguing that the district court did not abuse its discretion and that, in any event, the district court's denial is not an appealable order. We deny their motion to dismiss the City's appeal.
 
 
 [11]
 Tr. of proceedings at p. 16, July 22, 1980
 
 
 [12]
 See, e. g., Metropolitan Housing Development Corp. v. Village of Arlington Heights, 616 F.2d 1006 (7th Cir. 1980), where we stated:
 The trial court in approving a settlement need not inquire into the precise legal rights of the parties nor reach and resolve the merits of the claims or controversy, but need only determine that the settlement is fair, adequate, reasonable and appropriate under the particular facts and that there has been valid consent by the concerned parties. (cites omitted). Objectors must be given reasonable notice and their objections heard and considered.
 Id. at 1014.
 
 
 [13]
 As such, we have jurisdiction pursuant to 28 U.S.C. § 1292(a), which gives us power to hear appeals from orders "refusing to ... modify injunctions ..."
 
 
 [14]
 Given that a party to the case contests the motion, the joint motion fails to meet even the lesser standard the City urges us to apply. See Metropolitan Housing Development Corp. v. Village of Arlington Heights, supra at 1014, stating that the trial court "need only determine ... that there has been valid consent by the concerned parties."
 
 
 [15]
 Tr. of proceedings at p. 17, July 22, 1980; United States v. City of Chicago, 549 F.2d 415, 427, 434 (7th Cir. 1977)
 
 
 [16]
 The 1976 decree stated:
 9(c). An appropriate goal for the promotion of females to the rank of sergeant will be considered, upon appropriate motion when a sufficient number of females are available in the patrol officer rank.
 
 
 [411]
 F.Supp. at 251
 
 
 [17]
 In denying this portion of the joint motion, Judge Marshall stated that he would, in the future, consider establishing a goal for female sergeants. Tr. of proceedings at p. 18, July 22, 1980. On July 25, 1980, the United States moved to modify the 1976 decree to provide that 5% of the officers promoted to sergeant be female. This motion is still pending before Judge Marshall
 
 
 [18]
 So that the district court could insure that the permanent injunction was being complied with, the decree imposed reporting requirements on the City regarding the hiring and promotion of officers. On July 22, 1980, in the order denying the joint motion to modify, the district court ordered the City to seek court approval before making any promotions from either the 1973 roster or the 1979 roster. (The striking of the 1973 roster was affirmed by this court on July 9, 1980. United States v. City of Chicago, 631 F.2d 469 (7th Cir. 1980))
 
 
 [19]
 The Suess intervenors also moved to enjoin the City from striking the 1979 roster until the first 400 persons on that roster are promoted. FOP did not join in that motion, which the district court treated pursuant to Fed.R.Civ.Pro. 65 and denied. This denial is not appealed from
 
 
 [20]
 On July 29, 1980, this court ordered that the district court's order granting the promotion of police officers be stayed. On August 1, 1980, we vacated the temporary stay granted July 29
 
 
 [21]
 As Suess and FOP appeal from the denial of a motion to enjoin the promotion of police officers, this court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1)
 
 
 [22]
 Tr. of proceedings at pp. 14-15, July 25, 1980
 
 
 [23]
 On July 24, 1980, Mr. Lunblad, attorney for the Suess intervenors, argued that there had to be an evidentiary hearing in order for the 1976 decree to remain in effect. Tr. of proceedings at p. 8, July 24, 1980. Such an argument has no basis in law. Permanent injunctions, such as the 1976 decree, remain in effect until ordered dissolved by the district court or a court on appeal
 
 
 [24]
 An attorney for the FOP, Mr. Weiner, submitted an affidavit stating that he was advised by the City that there are studies for the 1979 procedures which the City believes establish the validity of the selection and ranking of the 1979 candidates. Tr. of proceedings at 6, July 25, 1980
 
 
 [25]
 Tr. of proceedings at p. 30, Aug. 27, 1980
 
 
 [1]
 I agree with the majority, majority opinion at 1115, that Judge Marshall has acted within his discretion in rejecting the proposed 10% promotional quota for women although some other such quota may be quite appropriate
 
 
 [2]
 The actual order entered by the district court contains the following language:
 
 
 [9]
 In order to remedy the present effects of the Chicago defendants' past discriminatory practices and procedures for promotion to sergeant ... (a) the Chicago defendants shall adopt and seek to achieve a goal of promoting (minorities) so as to have and maintain a sergeant mix reasonably representative of the patrol force ...."
 United States v. City of Chicago, 411 F.Supp. at 250.
 
 
 [3]
 The current non-discriminatory officers' examination can be expected to result in the hiring of minority police officers at a rate close to their application rate. This application rate shows no signs at the present times of rising to the 40% level. Minority candidates represented only 33% of those taking the 1971 examination. In 1975, minority candidates represented 28.6% of the applicant pool. Minority groups are thus applying to the police force at rates considerably below their representation in the city's work force, the source of the 40% quota, due to what might quite plausibly be non-discriminatory reasons. This casts even greater doubt on the propriety of a 60-40 sergeant's quota because it is not now foreseeable when minority representation on the force may reach 40%
 
 
 [4]
 There is some difficulty in justifying a 40% promotional quota when only 26% of those who took the sergeant's examination were minority candidates. Majority opinion at n.3. Indeed, if the promotional test produced such a disparity (40% as against 26%), it might be suspect as being unduly favorable to minority groups