Herbert **BADGLEY**, James **Barnes**, **Mitchell Chapman, Robert Gunsberg (a/k/a Robert Alvino), Maurice McCorkle, Frank Ricchiuti, Oscar Rodriguez and Henry Smith, inmates of the Nassau County Correctional Center, and Eugene Chapman, Lee McCorkle and Katherine Ricchiuti, members of inmates' families, individually and on behalf of all persons similarly situated, Plaintiffs–Appellants,**

v.

**Joseph J. SANTACROCE, Sheriff of Nassau County, Walter J. Flood, Warden of Nassau County Correctional Center, individually and in their official capacities, and the County of Nassau, Defendants–Appellees.**

No. 333, Docket 87–2277.

United States Court of Appeals,
Second Circuit.

Argued Dec. 3, 1987.

Decided June 27, 1988.

---

Matthew Muraskin, Atty. in Chief, Legal Aid Soc. of Nassau County, N.Y., Hempstead, N.Y. (Morton J. Marshack, Kent V. Moston, Hempstead, N.Y., on the brief), for plaintiffs-appellants.

James M. Catterson, Jr., Port Jefferson, N.Y. (William H. Pauley III, Charles D. Cunningham, Richard A. Braunstein, Snitow & Pauley, New York City, on the brief), for defendants-appellees.

Before NEWMAN, CARDAMONE, and PIERCE, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

Once again we encounter the continuing efforts of prisoners in the Nassau County Correctional Center (NCCC) to secure compliance with a consent judgment, originally entered October 7, 1981, and amended by agreement on October 9, 1984, to relieve jail overcrowding and remedy other challenged conditions. *See Badgley v. Varelas,* 729 F.2d 894 (2d Cir.1984) (*"Badgley I"*); *Badgley v. Santacroce,* 800 F.2d 33 (2d Cir.1986), *cert. denied,* 479 U.S. 1067, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987) (*"Badgley II"*); *Badgley v. Santacroce,* 815 F.2d 888 (2d Cir.1987) (*"Badgley III"*). The current appeal from an order of the District Court for the Eastern District of New York (Jacob Mishler, Judge) primarily concerns the propriety of an amendment of the consent judgment, sought by the jail officials and granted by the District Court over the objection of the prisoners. The amendment increases the maximum allowable population of the jail dormitory from 157 to 197. We conclude that the population limits at the NCCC may be increased

only on condition that the 40 beds added to the dormitory are used to secure compliance with the provisions of the consent judgment before being used for additional prisoners. Since the amendment was not so conditioned, we reverse and remand.

## Facts

The 1984 judgment (hereafter the "consent decree") established two population limits for the NCCC. Paragraph 4 sets 710 as the limit on the population in the cells, and paragraph 3 sets 157 as the limit on the population in dormitories. The combined population limit at the core facility of the NCCC is therefore 867. *Badgley II,* 800 F.2d at 35. In 1984, the New York State Commission of Correction approved the defendants' proposal to convert an unused mess hall into a dormitory and authorized the use of 40 beds in this space. After renovations were made, inmates were housed in this dormitory, starting in August 1986. In November 1986, the defendants moved in the District Court for an amendment to the consent decree to increase the 710 figure to 750. Though the 710 figure limits the population housed in cells and the added 40 beds are in the dormitory, the defendants' papers in support of their motion made clear that they wanted to place 40 more prisoners in the cells and in some unexplained fashion were using the additional 40 spaces in the dormitory as justification for the increase in the cell population. The prisoners moved to establish a deadline for compliance with various provisions of the decree.

In February 1987, the District Court issued an order temporarily allowing an increase of the 710 limit to 740, pending decision on the request for permanent modification of the consent decree. In *Badgley III* we vacated that order for lack of adequate findings and remanded for further proceedings. The District Court held a hearing in April 1987. The Court entered further temporary orders, raising the 710 figure to 740 on May 1 and to 750 on June 1. Then on June 5, Judge Mishler entered the order challenged on this appeal. That order, accompanied by a detailed opinion, authorized the defendants to use the dormi-

tory for 40 additional inmates. The District Judge explicitly stated that he was amending the consent decree to permit an increase in the limit on dormitory beds from 157 to 197 and was not permitting an increase in the 710 figure to 750. At the same time Judge Mishler denied the inmates' motion to establish deadlines for compliance with other provisions of the consent decree. On appeal, the prisoners challenge the amendment and the denial of relief concerning three additional matters.

## Discussion

■ A. *The Amendment.* In challenging the amendment to the consent decree the prisoners rely on the strict standards enunciated by the Supreme Court in *United States v. Swift & Co.,* 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), while the defendants urge upon us the more flexible standards we deemed appropriate to a decree effecting significant institutional changes in *New York State Ass'n for Retarded Children, Inc. v. Carey,* 706 F.2d 956 (2d Cir.), *cert. denied,* 464 U.S. 915, 104 S.Ct. 277, 78 L.Ed.2d 257 (1983) (hereafter *Willowbrook*); *see* Note, *The Modification of Consent Decrees in Institutional Reform Litigation,* 99 Harv.L.Rev. 1020 (1986). We believe that, as with many legal issues, the appropriate standard can better be distilled by examining what was decided in the cited cases than by characterizing the decisions in generalized terms such as "strict" and "flexible." In *Swift,* defendants, bound by a consent decree entered in an antitrust suit, sought modification to release them from a provision prohibiting them from holding interests in various lines of business, a prohibition they had observed for years. 286 U.S. at 113, 52 S.Ct. at 461. Modification was disapproved, as the Court was later to comment, because "the purposes of the litigation ... [had] not been fully achieved." *United States v. United Shoe Machinery Corp.,* 391 U.S. 244, 248, 88 S.Ct. 1496, 1499, 20 L.Ed.2d 562 (1968). In *Willowbrook* the defendants, bound by a decree requiring substantial reduction of the number of mentally retarded persons at Willowbrook

and their placement at other institutions housing no more than specified numbers of residents, sought modification to permit placement at institutions somewhat larger than those permitted by the decree. The defendants contended that institutions of the small size contemplated by the decree could not be found. The modification was permitted as a means of carrying out the fundamental purpose of the decree, which was to reduce the population at Willowbrook. *See Willowbrook, supra,* 706 F.2d at 969. Though some measure of flexibility is warranted in considering modification of consent decrees in the context of institutional reform, *id.,* the guiding principle, as illustrated in both *Willowbrook* and *Swift,* is that modification is favored when necessary to carry out the purposes of the original decree.

■ In the pending case, the manifest purpose of the decree is to relieve the overcrowding at the NCCC and thereby to permit the remedying of other grievances of the prisoners, all of which are attributable to overcrowding. For example, the decree places limits on the number of days that pretrial detainees and sentenced prisoners may be confined two to a cell and prohibits use of cots, except on the medical tier. The latter prohibition was adopted to end the practice of requiring prisoners to sleep in hallways and various other unobserved locations where they are subject to assault and their property to theft. Throughout the course of this protracted litigation we have recognized the close relationship between an end to overcrowding and the remedying of other grievances, such as extended use of double-bunking and use of cots. In *Badgley I* we withheld specific sanctions to enforce the provisions of the decree dealing with matters other than the population limit in the expectation that once the population was brought within the limits of the decree, "the County defendants should have little difficulty ending other violations of the consent judgment." 729 F.2d at 902–03. We reiterated this view in *Badgley III,* 815 F.2d at 889. Indeed, our concern for the absence of findings—a concern that prompted the remand in *Badgley III*—was directed not just generally at the lack of detailed justification for modification of the decree but specifically at the lack of a finding that the modification "would not impede" achievement of the goal of securing complete compliance with the entire decree. *Id.* at 889. Thus, in reviewing the findings now made in support of the modification, we must examine not only the adequacy of the District Court's justification for adding 40 more inmates to the dormitory, but also the Court's assessment of the effect of this increase in population upon the goal of securing compliance with all provisions of the decree. In making this inquiry, we bear in mind that noncompliance with the decree, especially the provisions apart from the population limits, has continued ever since the original decree was entered seven years ago and that adding prisoners to an overcrowded jail is an unlikely way to remedy violations that stem from overcrowding.

Judge Mishler recognized that his power to modify the decree "may be used only to help attain the goal intended by the decree." Decision of June 5, 1987, at 17 (citing *Willowbrook, supra,* 706 F.2d at 969). The Judge then endeavored to examine the effect of 40 additional prisoners in the dormitory upon the various requirements of the decree. With respect to food service, visits, indoor recreation, and use of the law library, he concluded that the additional 40 inmates would have either no adverse effect or at most a minimal adverse effect. These findings are adequately supported by the record. However, with respect to the durational limits on double-celling and the prohibition of use of mattresses on the floor and use of cots (except on the medical tier), the District Court made no finding as to the effect of adding 40 inmates. Instead, the District Judge initially noted that some double-bunking in excess of the limits in the decree "is evident from computer data offered at the hearing," Decision at 14, and that tabulations from this data showed cots in use outside the medical tier, *id.* at 15. Then, the Court discounted the significance of the data "due to the method of gathering and recording the computer data," *id.* at 14.

Because of this deficiency in the data, the Court concluded that "Plaintiffs have failed to establish that double bunking continues beyond the durational limits set forth in the Decree," *id.* at 23, and that "it is not clear that cots are routinely being used in non-medical areas," *id.* at 15.

■ This assessment of the provisions concerning double-bunking and use of cots was legally flawed in two related respects. First, any deficiency in the quality of the statistical data is the responsibility of the defendants, not the plaintiffs. The decree expressly imposes on the defendants the obligation to gather statistical data and furnish it to the plaintiffs. Second, and more fundamentally, the Court's analysis misapplied the burden of proof. Though the plaintiffs have the burden when seeking contempt sanctions for violations of the decree, the defendants have the burden when they are seeking to modify the decree. Thus, it was up to the defendants to show that adding 40 more prisoners to the dormitory would not impede their ability to comply with the essential provisions of the decree. Particularly as to the provisions of the decree limiting double-celling and use of cots—provisions directly related to the number of prisoners in the jail—the defendants had the burden of establishing that they were in compliance. Without proof of compliance with these provisions, the use of the 40 new dormitory beds to house additional prisoners prevents compliance with the decree to whatever extent these beds could be assigned to prisoners now housed in violation of the double-celling and cot provisions. Even if the record were silent on the issue of compliance with these provisions, the defendants, having failed to meet their burden, would not be entitled to an amendment adding 40 additional prisoners. In fact, the record contains explicit admissions of violations by the defendants. The Warden testified that inmates "have been in double-celling longer than permitted by the judgment," and an affidavit of defendants' counsel acknowledged that on "infrequent occasions" female prisoners may be placed on cots, presumably not within a cell or other restricted area, "because of a lack of space within the women's section."

■ We recognize, as the defendants contend, that total compliance with a consent decree is not an absolute precondition of any modification. *See Newman v. Graddick,* 740 F.2d 1513, 1519–20 (11th Cir.1984). At the same time, tolerance of partial non-compliance is generally more appropriate in a case like *Newman,* which involved a broad-ranging decree affecting the entire prison system of a state. Where, as here, a consent decree aims to achieve precise objectives at a single location, modification of essential provisions ought to be disfavored until those seeking change demonstrate that they are in substantial compliance with the decree and that the proposed change will have no adverse effect on future compliance. In this case, the defendants have shown that they are endeavoring to comply with much of the decree and are striving to resolve the basic problem of overcrowding by building a new facility. That is all to the good. But until the new facility is operating, no relaxation of the present decree can be accepted unless it promotes the purposes of the decree. The provision of 40 additional beds in the dormitory afforded the defendants an opportunity to secure an increased degree of compliance with provisions that have been ignored for years. In such circumstances, a modification to permit 40 additional prisoners to use those beds requires a heavy justification that has not been shown. The modification approved by the District Court will impede, rather than advance, compliance with the decree.

Now that the defendants have provided 40 new beds in the dormitory, the decree may properly be amended to increase the population limit of the dormitory only if these additional beds are first used to eliminate all violations of the double-celling and cot provisions and only then used to accommodate new prisoners. The current amendment is invalid because it permits the intake of 40 extra prisoners without regard to defendants' compliance with the other provisions. Upon remand, the District Court will revise its order to permit

the defendants to use the 40 new beds to accommodate new prisoners (up to the limit of 40) only to the extent that a new bed is not thereby rendered unavailable to a prisoner housed in violation of the double-celling and cot provisions of the decree who could, consistently with classification requirements, be moved to the new dormitory space.[1]

In light of this revision of the District Court's unconditional increase in the dormitory population limit, we see no need on the present appeal to order the District Court to take further action to secure compliance with other provisions of the decree. If, however, non-compliance continues, the District Court should not hesitate to take firm action, including use of the contempt power. Monitoring of compliance by a special master, as previously used at an earlier stage of this litigation, should be seriously considered.

B. *Nassau County.* Plaintiffs next allege that the District Court failed to include a condition agreed upon by the parties in an order adding Nassau County as a defendant in the lawsuit. In September 1986, the original defendants moved to join the County as a defendant because the defendant county sheriff had no right of indemnity against the County in the event monetary sanctions were imposed on him. Plaintiffs opposed the motion, fearing that matters already litigated would have to be litigated again. To resolve this dispute, the District Judge proposed that the County be joined only for a limited purpose and be bound by prior rulings. In open court, the Judge asked, "Do we understand now the county may be joined as a party with the understanding that the responsibility is equal to, not more than, equal to the liability of the Sheriff, [and] bound by the consent decree in the same manner as if the county had signed it?" No counsel objected. By order dated October 17, 1986, Nassau County was joined as a defendant. Plaintiffs then moved to amend the order to incorporate the agreed upon condition that the County is bound by the decree.

By order dated June 17, 1987, the District Court denied this motion, indicating an unwillingness to "interpret the legal effect" of adding the County.

Plaintiffs were entitled to have their motion granted. They did not seek a legal interpretation of the October 17, 1986, order. They sought only to have the order adding the County spell out the stipulated condition on which agreement to add the County had been reached. On remand, the order adding the County shall be amended to provide that Nassau County is bound by the consent judgment in the same manner as if it had signed it when the original parties did.

C. *Enforcement Provision.* Plaintiffs next allege that an order of the District Court dated October 17, 1986, impermissibly alters the terms of the enforcement mechanism of the decree. Paragraph 31 provides that no inmates will be received at the NCCC "until such time as the maximum in-house population of NCCC is no more than 710 plus the number of inmates actually housed in the dormitories" and thereafter no inmates will be received if their arrival "will increase the in-house population above 710 inmates, excluding those inmates actually housed in the dormitories...." This provision incorporates the terms of an order of the District Court entered March 13, 1984, and amended on March 26, 1984, which carried out a direction of this Court in *Badgley I*, 729 F.2d at 903. Upon receipt of the mandate in *Badgley II*, requiring implementation of the requirements of paragraph 31, 800 F.2d at 39, the District Court entered an order on October 17, 1986, enjoining the defendants from accepting any new prisoners (with an exception not pertinent to this appeal) "at any time the *in-cell* population reaches or exceeds 710" (emphasis added). Plaintiffs moved to amend the October 17, 1986, order, contending that it erroneously limited the enforcement mechanism of paragraph 31 to the "in-cell" population and failed to apply it to the dormitory

---

**1.** For example, if a female prisoner is assigned to a cot in violation of the decree, the availability of a bed in a dormitory section used by male prisoners would not bar the defendants from using that bed for a new prisoner.

population. They sought to have the quoted language from the October 17 order replaced with the words "at any time the *in-house* population reaches or exceeds 710 *plus the number of inmates actually housed in the dormitories up to 157*" (emphasis added). Judge Mishler denied the motion.

We think the motion was properly denied. In *Badgley I*, when we first required enforcement of a population limit, there was only a single limit for the core facility at the NCCC, since no dormitory then existed. When the parties negotiated an amendment of the original decree in 1984, they agreed upon two limits, a "maximum in-house population" of "710 plus the number of inmates actually housed in the dormitories," Decree, ¶ 4, and a limit on the dormitory population of 157, *id.*, ¶ 3. The enforcement provision of the decree, ¶ 31, is keyed to the first limit. Though the plaintiffs may have intended to have the enforcement mechanism apply whenever the non-dormitory population exceeded 710 *or* the dormitory population exceeded 157, the decree they negotiated applies the enforcement mechanism only to the non-dormitory population. Paragraph 31 explicitly refers to an "in-house population" of "710 plus the number of inmates actually housed in the dormitories." Though ¶ 3 limits the dormitory population, ¶ 31 does not enforce the dormitory limit.

When Judge Mishler entered the order of October 17, 1986, he quite understandably used the shorthand phrase "in-cell population" for the more cumbersome "in-house population ... excluding those inmates actually housed in the dormitories." We had previously used the same shorthand expression in *Badgley II*, 800 F.2d at 36. Of course, the 710 figure specified in paragraph 31 applies to all non-dormitory prisoners in the core facility, whether housed in cells, as contemplated by the decree, or housed in corridors in violation of the decree. The non-dormitory limit is 710. Moreover, the fact that the dormitory limit of 157 is not subject to paragraph 31 does not leave it unenforceable. This limit is enforceable through the contempt power.

It is simply not subject to the automatic mechanism of paragraph 31.

D. *Rearrested Inmates.* Finally, plaintiffs contend that some inmates were unlawfully rearrested after the District Court authorized their early release in an order of February 26, 1987. Apparently the Sheriff believed that some prisoners had been released who did not qualify for early release. When the plaintiffs sought the release of these rearrested inmates during the April 1987 hearing following the remand in *Badgley III*, Judge Mishler expressed doubt that he had jurisdiction to consider the matter, apparently believing that plaintiffs were in effect seeking habeas corpus relief without exhaustion of state court remedies. However, he made no specific ruling on the matter, nor has he done so since then, as far as we can determine. We therefore conclude that this aspect of plaintiffs' challenge is not properly before us for lack of an adverse ruling. If upon remand the plaintiffs elect to pursue this matter, which seems to be a needless complication in an already complex lawsuit, they may file a specific motion, which, when adjudicated, will be appropriate for our consideration. It may well be, however, that the affected prisoners have by now completed their sentences.

## Conclusion

The order of the District Court dated June 5, 1987, is vacated to the extent that it amends the consent decree to increase the population limit in the dormitories of the NCCC from 157 to 197 without requiring as many of the 40 new beds as are needed to be used at all times to secure compliance with the double-celling and cot provisions of the decree, consistently with classification requirements, before using the remainder of the 40 new beds for additional prisoners. The defendants shall be allowed sixty days from the date of our mandate to conform the use of the 40 new dormitory beds to the requirements of this opinion.

The order of the District Court dated October 17, 1986, shall be amended to include the stipulation of the parties set forth

in part C of this opinion. Appellants' other claims for relief are denied.

The judgment of the District Court is reversed, and the case is remanded for further proceedings consistent with this opinion. Appellants may recover two-thirds of their costs.