**The MONEY STORE, INC., Plaintiff–Appellant,**

v.

**HARRISCORP FINANCE, INC., Defendant–Appellee.**

No. 88–3015.

United States Court of Appeals, Seventh Circuit.

Argued March 29, 1989.

Decided Sept. 19, 1989.

Richard W. Young, Donald W. Rupert, Kirkland & Ellis, Washington, D.C., Daniel Vittum, Jr., Kirkland & Ellis, Chicago, Ill., William L. Mentlik, Lerner, David, Littenberg, Krumholz & Mentlik, Westfield, N.J., for plaintiff-appellant.

Richard H. Compere, Dean A. Olds, William, Brinks, Olds, Hofer, Gilson & Lione, Chicago, Ill., for defendant-appellee.

Before POSNER, FLAUM, and RIPPLE, Circuit Judges.

RIPPLE, Circuit Judge.

In 1983, the district court entered an order enjoining The Money Store, Inc. (TMS) from using its federally registered service mark "THE MONEY STORE" in the Chicago metropolitan area because Harriscorp Finance, Inc. (Harris) was a good faith junior user of the mark. In 1988, TMS filed a motion to modify the terms of the injunction so that it could employ the service mark in the Chicago area. The district court denied the motion. We now affirm.

## I.

### BACKGROUND

In April 1974, TMS received a service mark registration from the Patent and Trademark Office to use THE MONEY STORE in connection with moneylending services. Prior to TMS' federal registration of the mark, however, a local Chicago bank had been using the THE MONEY STORE mark. Harris purchased the mark from this bank in January 1974 and established a number of "Money Store" moneylending facilities in Chicago area shopping malls; Harris also advertised under the service mark. In 1977, upon seeking to expand its operations to the Chicago area and finding that another financial institution—Harris—was using the service mark, TMS filed an action in the district court alleging infringement by Harris on TMS' federally registered service mark THE MONEY STORE.

The district court held a bench trial and determined that Harris was a good faith junior user of the service mark and thus entitled to continue using the mark. Accordingly, it entered a permanent injunction preventing TMS from employing THE MONEY STORE in Harris' market area. *See The Money Store, Inc. v. Harriscorp Finance, Inc.*, 212 U.S.P.Q. 436, 439 (N.D. Ill.1980). On appeal to this court (the first appeal), we vacated the judgment and remanded the case in light of an error by the district court in interpreting the validity of Harris' acquisition of the mark and TMS' registration actions taken under the Lanham Act, 15 U.S.C. §§ 1051 *et seq. See The Money Store, Inc. v. Harriscorp Finance, Inc.*, 689 F.2d 666 (7th Cir.1982). We noted, however, that, on the precise issue of the allocation of service mark usage between Harris and TMS, the district court had correctly determined that Harris could "assert the rights of a good faith junior user in its market area, as that area shall be determined by the district court on remand." *Id.* at 679. The case thus returned to the district court. Subsequently, that court entered a permanent injunction detailing Harris' rights to the service mark in the Chicago area. *See* R.Vol. IV at *The Money Store, Inc. v. Harriscorp Finance, Inc.*, No. 77 C 3175 (N.D.Ill. Mar. 9, 1983) (judgment order) [hereinafter Order]. This injunction followed a hearing before the court, and the language of the judgment order completely adopted a Stipulated Motion for Entry of Judgment Order agreed upon by both parties. *See* Tr. of Feb. 1, 1983; R.Vol. IV at Stipulated Motion for Entry of Judgment Order (dated March 9, 1983).

This injunction stated, *inter alia,* that (1) TMS possessed a valid United States service mark registration in THE MONEY STORE issued on April 2, 1974, and (2) Harris, nevertheless, was a good faith jun-

ior user of the service mark in the Chicago metropolitan area.[1] The Order also permanently enjoined Harris from using THE MONEY STORE throughout the United States except within the Chicago metropolitan area and, correspondingly, permanently enjoined TMS from using the service mark THE MONEY STORE within the Chicago metropolitan area.[2]

In January 1988, TMS filed a motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure; in this motion, TMS requested that the district court modify the terms of the Order. The district court, the same judge who had overseen this case since its initial filing in 1977 presiding, conducted an evidentiary hearing to examine TMS' claim that Harris had abandoned the mark or so diminished its "Money Store" activities that a material change in circumstances had occurred, warranting modification of the Order. *See* Tr. of May 25, 1988. To support its motion, TMS presented the testimony of private investigator Thomas Gallo. *Id.* at 37–45; *see also* R.V at Gallo Affidavit. He testified that there was no "Money Store" listing in (1) any current Chicago area phone book, (2) the plaintiff-defendant indices of the Circuit Court of Cook County since 1983, (3) the records of the Illinois Secretary of State's office, or (4) Harris' own business directory. Moreover, Mr. Gallo stated that he visited the first floor of the Harris Bank building at 110 West Monroe Street in Chicago and inquired about the location of "The Money Store." According to Mr. Gallo, the receptionist informed him that "The Money Store" was not located there. Mr. Gallo also visited Harris' office in Summit,

Illinois and similarly found no one who was aware of "The Money Store."

In its decision, the district court set forth a number of findings of fact and conclusions of law. *See* R.Vol. V at *The Money Store, Inc. v. Harriscorp Finance, Inc.,* No. 77 C 3175, 1988 WL 96544 (N.D.Ill. Sept. 14, 1988) (memorandum opinion) [hereinafter Mem. op.]. The district court noted that in late 1983, Harris had sold its shopping center facilities to another financial institution, but retained the THE MONEY STORE service mark. After the sale, Harris opted to concentrate its "Money Store" operations on the tenth floor of the Harris Bank building in downtown Chicago. The district court found that the "receptionist at this downtown office answers the phone by saying 'Money Store,' and its invoices, stationery, and business cards all bear the service mark." Mem. op. at 2. Also, as of the date of the hearing, Harris' "Money Store" operation served over 700 customers with more than $20 million in outstanding loans. Furthermore, the "Money Store" had made $5–6 million in new loans within the previous six months. In light of these factors, the district court denied TMS' motion to modify the injunction because TMS had failed to demonstrate an exceptional change in circumstances warranting relief.

## II.

## ANALYSIS

### A. Governing Principles

The appellant submits that the district court erred in refusing to modify the 1983

---

1. The Order defined the Chicago metropolitan area as "consisting of Cook County and, the surrounding Illinois counties of Lake, McHenry, Kane, DuPage and Will." Order at 3, ¶ 10.

2. The precise language of the injunction provides:

> 13. Defendant [Harris], ... [is] hereby permanently enjoined and prohibited from using the mark "THE MONEY STORE" ... anywhere throughout the United States, except for the Chicago Metropolitan Area, as defined herein, in connection with the operation of retail establishments involving the sale, offering for sale or distribution of any moneylending, banking or other financial services or any other goods or services on or in connection

with which such use is likely to cause confusion, to cause mistake, or to deceive.

Order at 3. The court also enjoined TMS, stating that:

> 15. Plaintiff [TMS] ... [is] hereby permanently enjoined and prohibited from using the mark "THE MONEY STORE" ... anywhere in the Chicago Metropolitan Area, as defined herein, in connection with the operation of retail establishments involving the sale, offering for sale or distribution of any moneylending, banking or other financial services or any other goods or services on or in connection with which such use is likely to cause confusion, to cause mistake, or to deceive.

*Id.* at 4.

permanent injunction. Therefore, the principles underlying the Supreme Court's decision in *United States v. Swift & Co.*, 286 U.S. 106, 52 S.Ct. 460, 76 L.Ed. 999 (1932), must be our starting point. *See United States v. City of Chicago*, 663 F.2d 1354, 1359 (7th Cir.1981) (en banc). "In *Swift*, the Court recognized the inherent power of a court of equity to modify a decree in light of changed circumstances, 'to adapt its restraints to the needs of a new day.'" *Chicago*, 663 F.2d at 1359 (quoting *Swift*, 286 U.S. at 113, 52 S.Ct. at 462).[3] "The *Swift* decision has been codified in the Federal Rules of Civil Procedure." *Id.* at 1359 n. 16. Before the district court, TMS made its motion for modification under that codification—Rule 60(b)(5). Rule 60(b)(5) states that:

> (b) Mistakes; Inadvertence; Excusable Neglect; Newly Discovered Evidence; Fraud, etc. On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application....

Fed.R.Civ.P. 60(b)(5).

We review decisions by the district court on Rule 60(b)(5) motions under an abuse of discretion standard. *See Delaware Valley Citizens' Council v. Pennsylvania*, 755 F.2d 38, 41 (3d Cir.), *cert. denied*, 474 U.S. 819, 106 S.Ct. 67, 88 L.Ed.2d 54 (1985); *DeFilippis v. United States*, 567 F.2d 341, 343 (7th Cir.1977). Review under this standard is, of course, deferential. However, deferential review does not mean no review at all. *See Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 936–37 (7th Cir.1989) (en banc); *In re Ronco, Inc.*, 838 F.2d 212, 217 (7th Cir.1988). We must be satisfied that the district court's decision was guided by established principles of law.

Two fundamental principles are readily distilled from an examination of cases applying Rule 60(b)(5). First, this court has, on numerous occasions, spoken regarding the plaintiff's burden in requesting Rule 60(b)(5) relief: "[M]odification of a permanent injunction is extraordinary relief, and requires a showing of extraordinary circumstances." *Chicago*, 663 F.2d at 1360; *see also Daubert v. Percy*, 713 F.2d 328, 329 (7th Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1283, 79 L.Ed.2d 686 (1984); *Instrumentalist Co. v. Marine Corps League*, 694 F.2d 145, 154 (7th Cir.1982); *DeFilippis*, 567 F.2d at 342; *SEC v. Advance Growth Capital Corp.*, 539 F.2d 649, 652 (7th Cir.1976); *accord Klapprott v. United States*, 335 U.S. 601, 613, 69 S.Ct. 384, 389, 93 L.Ed. 266 (1949) (opinion of Black, J.). Second, and equally well settled, is the principle that consideration of a motion under Rule 60(b)(5) "does not allow relitigation of issues which have been resolved by the judgment." *DeFilippis*, 567 F.2d at 343–44; *see also, e.g., Instrumentalist*, 694 F.2d at 154.

These two principles are simply more precise articulations of the approach of Justice Cardozo in *Swift*. In that case, the Court addressed whether it should modify a ten-year-old antitrust injunction against certain large meatpackers that prevented them from entering into nonmeat aspects of the grocery business. The Court stated that:

---

**3.** In the Order, the district court *explicitly* retained its inherent equity power to modify the decree. The court stated that:

16. In order to permit each party to conduct its business while minimizing public confusion to the extent reasonably possible, each party shall have the right, notwithstanding Paragraphs 13 and 15 of this Judgment, to use the mark "THE MONEY STORE" to advertise its services throughout the United States. In order to protect the public interest and the parties, this Court shall retain jurisdiction of this matter, and each such party shall have the right to apply to the Court for further injunctive relief in accordance with principles of equity in the event that the other party's use of the mark "THE MONEY STORE" in advertising has resulted in a likelihood of confusion, mistake, or deception that injures or damages such party.

Order at 4–5.

The inquiry for us is whether the changes are so important that dangers, once substantial, have become attenuated to a shadow. No doubt the defendants will be better off if the injunction is relaxed, but they are not suffering hardship so extreme and unexpected as to justify us in saying that they are the victims of oppression. *Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions* should lead us to change what was decreed after years of litigation with the consent of all concerned.

286 U.S. at 119, 52 S.Ct. at 464 (emphasis supplied). Indeed, recognizing that the governing principles have their roots in *Swift* and its progeny, *see, e.g., United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 88 S.Ct. 1496, 20 L.Ed.2d 562 (1968), we have previously established a two-pronged analysis to guide the district court's consideration of a Rule 60(b)(5) inquiry:

> The standard for modification of injunctions that emerges from *Swift* and *United Shoe* is thus not based solely on hardship to the enjoined party. The standard also incorporates consideration of whether there remains any need to continue the injunction, that is, whether "the purposes of the litigation as incorporated in the decree" have been achieved.

*Chicago*, 663 F.2d at 1360 (footnote omitted); *see also Stewart v. General Motors Corp.*, 756 F.2d 1285, 1291 (7th Cir.1985).

*B. Application of Governing Principles*

■ On appeal, TMS concedes that Harris has not abandoned its use of the service mark. TMS suggests, however, that Harris' dwindling use of THE MONEY STORE "to the point of almost total invisibility" constitutes a sufficiently dramatic change to warrant modification of the injunction. Appellant's Br. at 20. It suggests, for instance, that the injunction could be modified to permit TMS to use, accompanied by a disclaimer, the service mark. In TMS' view, the district court erred in focusing on "the *absolute* level of Harris' present use of the mark THE MONEY STORE rather than considering the *relative* use between

1983 and 1988." Appellant's Br. at 22 (emphasis in brief). TMS sees the relative change in circumstances surrounding Harris' use of the service mark in the Chicago area as "extraordinary."

We cannot accept this view. In the original litigation, terminated by the 1983 Order, the district court determined that Harris was a good faith junior user of the service mark THE MONEY STORE in the Chicago metropolitan area. The present litigation is not an occasion to retry the fundamental issues at stake in that litigation regarding the "likelihood of confusion" between the TMS and Harris uses of the service mark. *See* Mem. op. at 6 ("Rule 60(b) 'does not allow relitigation of issues that have been resolved by judgment[.]' *DeFilippis v. United States*, 567 F.2d 341, 343–44 (7th Cir.1977)."); *see also* 11 C. Wright & A. Miller, Federal Practice and Procedure § 2863 at 206–07; § 2961 at 600–01 (1973). Rather, the key question before the district court on the Rule 60(b)(5) motion in 1988 was "whether there remains any need to continue the injunction." *Chicago*, 663 F.2d at 1360. On that issue, the district court noted that Harris' Chicago "Money Store" operation is still viable, having more than $20 million in outstanding loans and attracting new business every year, and that its invoices, stationery, and business cards all bear the service mark. The district court then concluded that "Harris' decision to cut back its 'Money Store' operation is insufficiently dramatic to justify an equitable modification of the judgment and the injunction. A simple reduction in business activity is not the type of change envisioned by the *Swift* court." Mem. op. at 5–6.

On this record, we cannot view this determination that Harris continues to use the mark in the Chicago metropolitan region as clearly erroneous. Nor, on this record, can we say that the district court erred in its conclusion that "Harris' decision to cut back its 'Money Store' operation is insufficiently dramatic to justify an equitable modification of the judgment and the injunction." Mem. op. at 5. Accordingly, the purposes of the original litigation

have not been achieved, and the need to continue the Order remains. *See Chicago,* 663 F.2d at 1360. Therefore, the district court properly denied TMS' motion for modification of the injunction.

## CONCLUSION

The district court did not abuse its discretion in denying The Money Store, Inc.'s motion to modify an injunction under Federal Rule of Civil Procedure 60(b)(5). Accordingly, we affirm the judgment of the district court.

AFFIRMED.

POSNER, Circuit Judge, concurring.

I write separately not to register disagreement with anything in Judge Ripple's opinion but to propose that the standard for modifying injunctions be viewed differently in litigation over property rights—a type of litigation well illustrated by the present case—from how it is viewed in litigation designed to reform public agencies, a type of litigation illustrated for example by a case in which a prison is enjoined from mistreating its inmates. The hard line against modification that the district judge and we have taken in this private case is sensible for private cases but not for "institutional reform litigation," such as my hypothetical prison case. An intermediate case, which I discuss briefly later, is institutional reform litigation directed against a private rather than a public entity.

The injunction that The Money Store [TMS] seeks to modify resolved a dispute between it and Harriscorp Finance over the right to use the name "The Money Store" as a trademark. The resolution was to enjoin TMS from using the name in Chicago and Harriscorp from using it anywhere else. In effect, the injunction defined the respective scope of the parties' property rights—giving Chicago to Harriscorp and the rest of the country to TMS—and it is desirable that such definitions be as clear and definite as possible in order to facilitate transactions. Harriscorp's dwindling use of the name "The Money Store" since the injunction was entered suggests that

the right to use the name in Chicago as elsewhere has become more valuable to TMS than to Harriscorp. If so, TMS can be expected to buy the right from Harriscorp at a mutually agreeable price—and indeed the record indicates an extended effort by TMS to do just that, the failure of which (no doubt due to TMS's unwillingness to pay as high a price as Harriscorp demanded) precipitated the application to modify the injunction. By our decision today we rightly decline to encourage TMS to hope that it can obtain the right to use the name "The Money Store" in Chicago for nothing but attorney's fees by persuading the district judge to modify the injunction on the basis of the relative value of the name to the parties. We refuse to do in this case what the law in general refuses to do—condition property rights on the ability of an owner to show that his is the most valuable use to which his property can be put. By forbearing to attach such conditions, the law assigns the task of reallocating property rights to the market rather than to the judiciary. If TMS wants to use the name "The Money Store" in Chicago, it must buy the name from its owner.

It is a detail that in speaking of a trademark as a property right, I am using the term "property rights" loosely, just as when one speaks of a taxi medallion or a television license as "property"—which, functionally, they are. It is also a detail that if rather than seeking to modify the injunction TMS had violated Harriscorp's property rights by using the name "The Money Store" in Chicago without Harriscorp's leave, Harriscorp, rather than having to bring its own suit to remedy TMS's "trespass," could have asked the district court to hold TMS in contempt. The injunction created a system of de facto property rights, and a property right should be enforceable whether or not the present owner values it more than the trespasser. The trespasser should not be allowed to bypass the market.

I do not want to overargue the point. Taken literally, the idea that an injunction resolving a dispute over property rights is itself a form of property might be thought

to imply that it could not be modified without violating the takings clause of the Fifth Amendment, a proposition rejected long ago, and rightly so even if "property" is broadly construed. See *Ladner v. Siegel Co.*, 298 Pa. 487, 148 A. 699 (1930), cited in *United States v. Swift & Co.*, 286 U.S. 106, 114, 52 S.Ct. 460, 462, 76 L.Ed. 999 (1932). The scope of a property right is a matter of expectations, and Harriscorp could not reasonably have expected its injunctive right to be immune from modification by the court that had issued the injunction. The district court had expressly reserved the power to modify the injunction, and such a reservation was in any event implicit. See *United States v. Swift & Co., supra,* 286 U.S. at 114, 52 S.Ct. at 462. The existence of a reserved right of modification distinguishes cases such as *Hodges v. Snyder,* 261 U.S. 600, 603, 43 S.Ct. 435, 436, 67 L.Ed. 819 (1923), which teach that "the private rights of parties which have been vested by the judgment of a court cannot be taken away by subsequent legislation."

There are trademark cases, as there are other property cases, where the modification of an injunction has been held to be proper. An example is *Coca–Cola Co. v. Standard Bottling Co.*, 138 F.2d 788 (10th Cir.1943), where as a result of an old decree enforcing a trademark that other courts had found invalid, the party seeking modification (the defendant) was the only firm not allowed to use the word "cola" to describe its soft drink. The continuation of the injunction would have enabled the plaintiff to extort a price for its dissolution unrelated to the plaintiff's property in the word. Admittedly, there is a danger of that here. But the district court found that Harriscorp was making *some* use of the name "The Money Store." Its refusal to relinquish its right was not purely extortionate.

Property rights are never absolute, and specifically, as we have just seen, the form of "property right" created by an injunction is subject to modification by the issuing court, just as a fee simple is subject to modification by nuisance law and eminent domain. Nevertheless the considerations bearing on modification are not the same in a case where an injunction creates property rights as they are where an injunction regulates the activities of a public agency. Injunctions of the latter type frequently have effects on third parties whose interests are not adequately represented by the parties to the litigation or by the court. And the litigation may be collusive, yet this fact may be concealed from the court. The two points are related; sometimes an unrepresented third party is hurt because the parties to the litigation have ganged up against him.

We had such a case recently, and though it was not a modification case it is instructive. Black police sergeants had sued the City of Chicago, charging racial discrimination, and had obtained a remedial decree. Many years later the decree was still in effect, but by then Chicago had a black mayor and a black police chief. The parties submitted to the district court a proposal, which the court promptly accepted since no one before it was objecting, to alter the results of the test for promotion to lieutenant—even though it was a test the parties had devised jointly—in order to increase the number of blacks promoted to that rank. The white sergeants who would be hurt by the proposal were not represented in the litigation. We held that they were entitled to intervene. See *United States v. City of Chicago*, 870 F.2d 1256 (7th Cir.1989). In their new status as parties they would be entitled to press for modification of the decree to reflect the changed political circumstances in Chicago.

*Alliance to End Repression v. City of Chicago*, 742 F.2d 1007 (7th Cir.1984) (en banc), a case about the interpretation rather than the modification of an institutional reform decree, is also instructive. Mindful of third-party effects and potential lack of adversariness, we interpreted the decree more liberally than we would have interpreted a private decree; probably we would have been receptive to a proposal to modify it. In the waning days of the Carter Administration, the Justice Department had consented to the entry of a decree limiting the investigative powers of the FBI in Chicago. The Reagan Administration adopted

new FBI guidelines which arguably were less stringent than the consent decree—creating the potential paradox that the FBI might have fewer powers in Chicago than anywhere else in the United States. We interpreted the decree to avoid this anomaly. It would have been a cleaner case if the Justice Department had asked us to modify the decree to bring it into line with the current guidelines, but the Department no doubt was inhibited by the traditional reluctance of courts to modify decrees except in the most exceptional of circumstances.

The reluctance is misplaced in the setting of institutional reform litigation. A court should be wary of efforts by government officials to use a tacitly collusive suit to bind the officials' successors and otherwise thwart the interests of the public. It should therefore be receptive to proposals to modify the decree in such a suit, if modification is designed to lighten what may well be the dead hand of the past. It should be especially receptive where the decree was a consent decree entered without any adversary proceedings, for there the danger of collusion is at its height. Decrees entered after token opposition should be viewed similarly. Of course many consent decrees settle genuinely adversary contests, whether or not there have been formal adversary proceedings; I am speaking of a risk, not a certainty, of collusion or of lack of adversary zeal. A further point is that a decree may become collusive through passage of time, as in the *City of Chicago* case.

The "regulatory" decree—the decree that burdens the courts with continuing supervisory responsibilities unlimited in duration—has long been thought problematic in other contexts, even when the danger of collusion was slight. See, e.g., DeBow, *Judicial Regulation of Industry: An Analysis of Antitrust Consent Decrees,* 1987 U.Chi.Legal Forum 353, 359. The problems have sometimes been overlooked in the institutional reform context in the rush to enlist the courts in the cause of social reform. But consider: Correctional authorities often welcome suits to reform prison conditions, in the hope that the re-sulting decree will force the state to appropriate additional money for the prisons. Realistically, these are collusive suits. They bypass not only the democratic process but also the adversarial process.

The strong policy against modification rightly expressed in a case such as the present would be perverse in an institutional reform case. We should relax the policy in such cases, and we can do so without exceeding our authority. The standard in Rule 60(b)(5) of the Federal Rules of Civil Procedure—whether continued enforcement of a prospective decree would be equitable—is flexible enough to allow my suggested modification of the modification rule. And the famous tough language in Justice Cardozo's opinion for the Supreme Court in *United States v. Swift & Co.,* supra, 286 U.S. at 119, 52 S.Ct. at 464. "Nothing less than a clear showing of grievous wrong evoked by new and unforeseen conditions should lead us to change what was decreed after years of litigation with the consent of all concerned"—is not a bar. Judicial language, like other language, should be read in context. *Swift* involved a request by a private defendant to modify an antitrust decree against it. It was not an institutional reform case. There were few such cases at the time. The efflorescence of this type of federal litigation lay many years in the future.

In fact *Swift* itself makes the very distinction that I am suggesting "between restraints that give protection to rights fully accrued upon facts so nearly permanent as to be substantially impervious to change, and those that involve the supervision of changing conduct or conditions and are thus provisional and tentative." *Id.* at 114, 52 S.Ct. at 462. See also *Safe Flight Instrument Corp. v. United Control Corp.,* 576 F.2d 1340, 1342 (9th Cir.1978) (per curiam); *Newman v. Graddick,* 740 F.2d 1513, 1520 (11th Cir.1984). Modification should be more difficult in the first class of cases, illustrated by the present case, than in the second class, which includes institutional reform litigation, see, e.g., *Nelson v. Collins,* 659 F.2d 420, 424 (4th Cir.1981) (en banc). There is growing

recognition of the distinction. See *Duran v. Elrod*, 760 F.2d 756, 758 (7th Cir.1985); *Alliance to End Repression v. City of Chicago, supra,* 742 F.2d at 1020; *Kozlowski v. Coughlin*, 871 F.2d 241, 247 (2d Cir.1989); *Ruiz v. Lynaugh*, 811 F.2d 856, 861 (5th Cir.1987) (per curiam); *New York State Ass'n for Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967–71 (2d Cir.1983); see also *Twelve John Does v. District of Columbia*, 861 F.2d 295, 298 (D.C.Cir. 1988); *Badgley v. Santacroce*, 853 F.2d 50, 52–53 (2d Cir.1988). "A strict standard for modification of consent decrees between private parties ... is inappropriate in institutional reform litigation." *Plyler v. Evatt*, 846 F.2d 208, 212 (4th Cir.1988); see also Note, *The Modification of Consent Decrees in Institutional Reform Litigation*, 99 Harv.L.Rev. 1020 (1986).

I have contrasted litigation over property rights with litigation aimed at the reform of public agencies, but there are other kinds of equitable litigation, notably litigation seeking to reform private institutions. Some of that litigation presents the same danger of abuse as litigation aimed at bringing about institutional reform in the public sector. Suppose a group of white workers brought a "reverse discrimination" suit complaining about the effect of their employer's affirmative-action plan on the employment of whites. The employer might be entirely willing to consent to the entry of a decree that would make it more difficult to hire blacks. If the black workers persuaded the employer to seek modification of the decree, the court ought not consider itself cabined by the strict language of *Swift*. This conclusion is bolstered by the Supreme Court's recent decision in *Martin v. Wilks*, — U.S. —, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), which holds that a decree settling an employment discrimination case does not bar workers adversely affected by the decree from challenging its validity in an independent suit. It would be odd to suppose that if they sought to modify the decree rather than challenge it in a separate suit—if in short they followed a cleaner, quicker route— they would face the heavy burden that a literal reading of *Swift* might be thought to impose. Cf. Laycock, *Consent Decrees Without Consent: The Rights of Nonconsenting Third Parties*, 1987 U.Chi.Legal Forum 103, 143–44. Why encourage collateral attacks in lieu of motions to modify? Cf. Kramer, *Consent Decrees and the Rights of Third Parties*, 87 Mich.L.Rev. 321, 364 (1988).

I am not urging that modification of institutional reform decrees be allowed at the drop of a hat. If it is too easy to modify a decree, the negotiation of consent decrees will be retarded because the parties will not know what they are getting into; they will be delegating an open-ended power to the court. Maybe there *should* be fewer consent decrees in institutional reform litigation; maybe there should be less such litigation. But there might be too few such decrees, and too little such litigation, if consent decrees in institutional reform litigation were too freely modifiable, too flexible. Certainly in this case, however, we do not have to decide how flexible is too flexible. This case involves not institutional reform but private property; in such a case, within broad limits, the less hospitable the courts are to pleas to modify, the better.