894 F.2d 943
 52 Fair Empl.Prac.Cas. 271,
52 Empl. Prac. Dec. P 39,629
UNITED STATES of America, et al., Plaintiffs-Appellees,
v.
CITY OF CHICAGO, Defendant-Appellee,
and
Fraternal Order of Police Lodge 7, Intervenor/Defendant-Appellant.
UNITED STATES of America, Plaintiff,
and
Patricia Stube, Intervenor/Plaintiff-Appellant,
v.
CITY OF CHICAGO, Defendant-Appellee.
 Nos. 88-3301, 88-3462.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 12, 1989.
Decided Feb. 6, 1990.
 
 Anton R. Valukas, U.S. Atty., Chicago, Ill., for U.S.
 Judson H. Miner, Ruth M. Moscovitch (argued), Appeals Div., Mardell Nereim, Office of Corp. Counsel, Chicago, Ill., for City of Chicago.
 Stanley H. Jakala (argued), Berwyn, Ill., for Fraternal Order of Police, Lodge 7 and Patricia Stube.
 Kimberly A. Sutherland (argued), Chicago, Ill., for Patricia Stube.
 Before BAUER, Chief Judge, and CUMMINGS and EASTERBROOK, Circuit Judges.
 BAUER, Chief Judge.
 
 
 1
 For approximately the last twenty years, the Chicago Police Department promotion process has been a fountain of substantial, protracted litigation. Since 1976, when the district court determined that the 1971 sergeant's promotion exams had a discriminatory impact upon blacks, Hispanics and females, the process of promoting patrol officers has been conducted pursuant to the district court's equitable decree and in accordance with court-imposed quotas. The City's attempts to develop and administer subsequent, nondiscriminatory exams have not met with complete success. These efforts have confronted the district court with the difficult question of how to proceed with the necessary task of fairly promoting police officers within the Department. The equitable orders of the district court have spawned numerous appeals to this court. When an aspect of the promotion process was last before us, we likened the litigation to the interminable equity proceedings ridiculed in Charles Dickens' Bleak House. United States v. City of Chicago, 870 F.2d 1256, 1259 (7th Cir.1989).
 
 
 2
 In one of its more recent orders, the district court granted the City permission to promote officers from a roster generated after candidate exam scores were standardized for exam rater bias and race. The intervenors-appellants objected to the City's use of the new roster because they claimed that the decision to standardize the raw exam scores was inappropriate absent a determination that the exam is not valid and job-related. The district court made it clear, however, that it was not considering the merits of the standardization decision or process; the narrow issue before the court was whether the City could proceed in fulfilling its pressing promotion needs from the roster before it. On appeal, the intervenors-appellants seek to reassert their claims about the merits of the City's standardization decision and process. They urge us to reverse the district court's order and remand with directions to promote on the basis of the new exam scores. Because the merits of the City's standardization decision were not before the district court nor a matter addressed in its order, we cannot address the issue here.
 
 I. Procedural Background
 
 3
 From the inception of this litigation,[1] the promotion of patrol officers to the rank of sergeant has been governed by the Illinois Municipal Code. The Code provides that candidates for promotion within the department must pass a competitive, qualifying exam in order to be placed upon an eligibility roster for promotion by rank order. Ill.Rev.Stat., ch. 24 pp 10-1-7, 10-1-12, 10-1-13 and 10-1-14 (1989). The exams and promotion rosters generated pursuant to this requirement have been the focus of this litigation since 1970, when a number of private parties filed complaints challenging the entirety of the Department's testing procedures and promotion processes. In 1973, these cases were consolidated with a suit brought by the United States. The United States alleged, among other things, that the City's exam and procedures violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e, et seq.
 
 
 4
 After conducting an extensive trial on the merits, the district court determined, among other things, that the sergeant's promotion examination and procedures administered by the City had a disparate impact upon candidates based upon their race, ethnicity and gender. United States v. City of Chicago, 411 F.Supp. 218, 225 (N.D.Ill.1976). To remedy the discriminatory effects of these past practices and procedures, the court ordered the City to
 
 
 5
 adopt and seek to achieve a goal of promoting blacks, Spanish-surnamed persons and females to the rank of sergeant so as to have and maintain a sergeant mix reasonably representative of the patrol force.... To ensure as quickly as practicable the attainment of this goal, 40% of the promotions to the rank of sergeant shall consist of black and Spanish-surnamed persons, subject to the availability of qualified applicants, until further order of this court.
 
 
 6
 Id. at 250. This court affirmed the district court's determination as well as the equitable decree ordering the promotion of sergeants according to the 40% quota. United States v. City of Chicago, 549 F.2d 415 (7th Cir.), cert. denied 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). We concluded that as an equitable remedy, the 40% quota "would eradicate as far as possible the past effects of discrimination and prevent discrimination in the future." Id. at 436.
 
 
 7
 The district court retained jurisdiction over the litigation for the purposes of ensuring compliance with its decree. In 1978 and 1979, the City developed and administered a new set of sergeant's exams. However, it concluded that the eligibility roster generated by these exams would effectively perpetuate the adverse impact the process had upon black, Hispanic and female candidates. Accordingly, the City proceeded with its promotions on the basis of the old roster and in accordance with the quotas established by the district court and affirmed on appeal.
 
 
 8
 In 1980, the United States and the City filed a joint motion before Judge Marshall seeking a modification of the 40% quota. On January 22, 1980, the district court denied that motion, prompting an appeal to this court. The appeal resulted in an en banc decision in which a majority of this court held that changes in the composition of the patrol force required the modification of the 40% quota. United States v. City of Chicago, 663 F.2d 1354 (7th Cir.1981). We concluded that the "essential purpose of that quota (parity of minority representation, at a substantial level, between patrol officers and sergeants) has been achieved" and that a "continuation of the quota without modification" was therefore inequitable. Id. at 1360.
 
 
 9
 In light of these changed circumstances, we held that the modifications in the quotas proposed by the United States and City--a 25% quota for black and Spanish-surnamed patrol officers--were appropriate. Id. at 1362. We remanded the case with directions to the district court to allow promotions in accordance with these modified quotas. We also sought to chart the course of any future modifications in the district court's decree:
 
 
 10
 Finally, we must note that, like the original decree itself, the 25% minority promotional quota adopted today is subject to relatively easy modification as the facts from time to time warrant in order to vindicate the decree's original objectives. In particular, should nondiscriminatory hiring practices now in effect (or some judicially approved substitute) begin to produce a patrol force more nearly representative of the racial and ethnic competition of the City's work force, the district court should entertain a motion to further modify the decree to assure the maintenance of parity between the patrol officer and sergeant work forces, at least until the City has produced a nondiscriminatory method for promoting patrol officers. In the latter event, the decree itself, to the extent that it prescribes quotas, may become obsolete.
 
 
 11
 Id. at 1362.
 
 
 12
 On remand, the district court, after holding an evidentiary hearing, ordered that promotions from the 1979 exam roster take place in compliance with the modified quotas. On April 7, 1987, the court ordered that no further promotions be made from the 1979 roster. In the interim, the City had developed a new exam. It sought to administer the new exam and establish an eligibility roster that would meet its hiring needs through 1991. The City projected that it would promote 500 patrol officers from the new roster. Its immediate needs required the promotion of 210 candidates promptly.
 
 
 13
 In developing the new exam, the City sought the input of incumbent black and Hispanic sergeants in determining the tasks and "knowledges, skills and abilities" ("KSA's") that are important to the successful performance of the position. This process revealed that minority incumbents viewed the nature of the sergeant's position and the KSA's differently than their white counterparts. On the basis of this difference, the City's expert speculated that the raw exam scores of the applicants would need to be standardized to obtain an accurate measure of the ability of all candidates according to an overall assessment of the position.
 
 
 14
 The exam ultimately administered by the City consisted of four weighted portions: (1) a multiple choice test constituting 28%, (2) a short answer test consisting of 29%, (3) an oral board examination consisting of 40%, and (4) a performance evaluation consisting of 3%. The multiple choice portion of the exam was administered first, followed by the short answer portions and the oral boards. The performance component was then factored into the composite score.
 
 
 15
 Of the 3416 candidates who took each component of the 1987 exam, 2294 or 67.2% of the total candidate pool were white males, 930 or 27.2% were black males, 192 or 5.6% were hispanic males, and 414 or 12.1% were female. The raw exam scores of the top 500 candidates broke down as follows: on the basis of race and ethnicity, 416 of the top 500 candidates or 83.2% were white, 66 or 13.2% were black, and 18 or 3.6% were Hispanic. On the basis of gender, 425 or 85% of the top 500 candidates were male and 75 or 15% were female.
 
 
 16
 In the face of these results, the City determined that the promotion on the basis of the raw exam scores, prior to standardization for exam rater bias (i.e. one rater's tendency to grade harder than another) and race, would have an extreme adverse impact against blacks and hispanics. It also concluded that the adverse impact could not be accredited to blacks and Hispanics scoring significantly lower than whites on the exam. See Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. 1607 et seq. (a test which causes adverse impact under the 80% rule cannot be used on a rank order basis unless it can be shown "that a higher score ... is likely to result in better job performance".). Id. at Section 14(c)(9). The following drawn from the City's motion before the district court reflects its position:
 
 
 17
 The City believes that it has developed a test that is derived from and related to specific tasks to be performed by police sergeants and the knowledges, skills and abilities necessary to perform these tasks. However, if this examination were to be used as a rank order instrument, without employing racial standardization, Hispanic and black candidates would have a success ratio that was significantly less than the 80% of the success ratio for whites. This difference in success would be based on a rank order roster where the point scores are so close that the difference of one point can result in a candidate moving almost 200 places on the roster. The City does not believe that minute differences in scores reflect meaningful differences in a candidate's ability to perform the complex and sensitive job of police sergeant.
 
 
 18
 Finally, the City concluded that standardization was necessary in order to comply with the district court's standing decree to achieve a goal of promoting blacks, Spanish-surnamed persons and females to the rank of sergeant.
 
 
 19
 After standardizing the test results, the promotion roster of the top 500 candidates broke down as follows. On the basis of race and ethnicity, 332 of the top candidates or 66.4% were white, 138 or 27.6% were black, and 30 or 6% were Hispanic. On the basis of gender, 422 or 84.4% of the top 500 candidates were male and 78 or 15.6% were female. The City then sought the district court's approval to promote by rank order form this standardized promotion roster. The City also sought to superimpose a quota of 20% additional female candidates and 10% additional Hispanic male candidates. It argued that the additional quotas were necessary to insure that the gender and ethnicity of those promoted to the rank of sergeant would mirror that of the patrol officers.
 
 
 20
 After a hearing and additional briefing on the matter, the court entered an order on November 21, 1988, granting the City's request to promote from the standardized list. In its order, the court pointed out that it had been inundated with a "veritable avalanche of objections, suggestions or requests for larger quotas and other specialized relief." At the center of the avalanche were numerous motions to permit extensive discovery on the development of the roster and a number of motions to intervene. The court denied the motions to intervene. With reference to the requests for further discovery, the court held that
 
 
 21
 the United States, the Fraternal Order of Police and Stube want us to continue in force the injunction which we have imposed upon the promotions to the rank of sergeant despite the fact that the City has voluntarily developed a non-discriminatory promotion list. We decline to do so. None of these objectors has made any showing that the methods employed by the City are unlawful. Furthermore, we do not judge the validity of those methods at this time. The only question before us is whether the City should be permitted to make promotions from a non-discriminatory roster. We hold that it should be.
 
 
 22
 The district court rejected the City's request to superimpose additional quotas upon the roster. The court concluded that "the time has come to end court imposed promotion quotas with respect to the rank of sergeant.... the new examination and roster promotes evenly from the applicant pool and in due course the various levels of rank in the Chicago Police Department will mirror one another."
 
 II. The Present Appeal
 
 23
 The Fraternal Order of Police, Lodge 7 ("FOP"), the intervenor defendant, filed its notice of appeal on November 28, 1988. It also filed an emergency motion for a stay or injunctive relief pending appeal with both the district court and this court. These motions were denied. On November 29, 1988, this court concluded that FOP had failed to show that it would suffer any irreparable harm from allowing the promotions to proceed. Intervenor plaintiff Stube filed her notice of appeal on December 19, 1988.[2] On December 22, 1988, this court, on its own motion, consolidated the appeals of the intervenors.
 
 
 24
 On appeal, the FOP and Stube contend, in essence, that the standardized promotion roster discriminates against whites. They argue that the standardized roster is no different than imposing quotas upon the previous lists and is unlawful absent some showing that the new exam itself is not valid and job related. After all of this review, these claims are of little moment and need not detain us long. The district court made it clear that it was not judging the validity of the methods employed in standardizing the roster when it approved the City's request to promote from it. On appeal, the intervenors-appellants continue to argue about the validity of the City's methods of standardization. Until the district court addresses the matter, however, the issue is not properly before this court. For the moment then, the intervenors-appellants' quarrel is with the district court. They must seek their relief in that forum before this court may properly act.
 
 
 25
 AFFIRMED.
 
 
 26
 EASTERBROOK, Circuit Judge, concurring.
 
 
 27
 A generation has elapsed since this suit began. Four Presidents (Nixon, Ford, Carter, and Reagan) completed their terms; a fifth has entered office. Five mayors (Daley, Bilandic, Byrne, Washington, and Sawyer) have run their course; a son of the first Mayor Daley holds that office today. Federalists governed the United States for only 12 years. If this case had been filed when the Constitution was adopted, we would be nearing the end of Thomas Jefferson's stay in the White House; the Alien and Sedition Acts would have come and gone, the Louisiana Purchase would have been completed, four Chief Justices would have occupied center chair at the Supreme Court, and the War of 1812 would be on the horizon. Chicago's police have been under judicial control almost as long as the interval between Pearl Harbor and the Kennedy Administration.
 
 
 28
 Begun as a means to end persistent discrimination against black, Hispanic, and female aspirants to the police force, the case has become a vehicle for all manner of beefs about the local bureaucracy. Every civil service system has its foibles; until Bigby v. City of Chicago, 766 F.2d 1053 (7th Cir.1985), some litigants bent their efforts to making Chicago's "better" without regard to discrimination. As legal winds shifted, see City of Richmond v. J.A. Croson Co., 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989), new parties have appeared to contend that in carrying out the decree--or going beyond it--Chicago has begun to discriminate against white and male aspirants.
 
 
 29
 Today's beneficiaries of the decree, no matter their race or sex, are not victims of discrimination by the Police Department of Chicago. Those whose hopes the City dashed in the 1930s, the 1940s, the 1950s, and the 1960s are in other lines of work--or in their graves. Some applicants for the force were born about the time the case began. Many who seek promotions were brought into the force by the quotas in the decree; their race and sex has worked in their favor.
 
 
 30
 Disputes today swirl around the percentage of blacks, women, and other protected groups on each new promotion list and in each grade of the police force. Yet whether the current composition of the force (or any rank within it) mirrors the applicant pool is irrelevant. Inferences from the composition of the work force confuse stocks and flows. Lieutenants may be predominantly white and male because of discrimination in hiring patrolmen in the 1950s. As new crops of officers move up through the ranks and older officers retire, the ratios will change. All anyone is entitled to expect--all the federal courts are entitled to demand--is that new applicants for the force (and each higher grade within it) be treated as persons, without regard to race, national origin, and sex. Wards Cove Packing Co. v. Atonio, --- U.S. ----, 109 S.Ct. 2115, 2121-23, 104 L.Ed.2d 733 (1989).
 
 
 31
 Quotas have been justified as temporary devices, as methods to prime the pump. They cannot be justified over the long haul as "remedies", when the beneficiaries are the children and grandchildren of victims, if related to victims at all. Enduring quotas are inconsistent with their own justification. Continuation of this litigation gives the impression that the district judge is an ombudsman, that because we deal with a "remedy" the court may reshape the civil service system of Illinois to meet the latest perceived ill. Equitable decrees move the locus of politics from City Hall to the courthouse. Power to change the quotas on discretionary grounds encourages pie-slicers to seek larger shares. It offers hope yet withholds the justification of law. Employment on Chicago's police force is not a fief to be obtained from a federal court; even if the lord is generous to his vassals, the principle of organization is objectionable.
 
 
 32
 From a managerial perspective--important if we are to have such long-running decrees--things have become Byzantine. Look at the court's opinion (which I join): a four-page runup to a one-paragraph disposition, necessary because it is almost impossible to tell what is going on. As years go by, more parties intervene. Motion calls resemble the City Council. No one knows how many parties there are; recently we dismissed one aspect of the case in which the lawyer seemed to have lost his clients--and no one noticed! Bigby v. City of Chicago, 871 F.2d 54 (7th Cir.1989) (dismissing the appeal for want of appellate jurisdiction without deciding whether there is still a case or controversy). While some are allowed through the portals, others are rebuffed--sometimes because the applications are untimely, sometimes because another person represents the same point of view but the intervenor could not find out. Recently we dragooned a party into this case out of fear that failing to make a claim in this forum would forfeit it. United States v. City of Chicago, 870 F.2d 1256 (7th Cir.1989). The fear was not realized, see Martin v. Wilks, --- U.S. ----, 109 S.Ct. 2180, 104 L.Ed.2d 835 (1989), but the complexity grows. It is long past the time when a citation to United States v. City of Chicago would summon up a rule of law, as opposed to a raven's nest of problems.
 
 
 33
 This case began before the Supreme Court decided its first affirmative action case. As the law evolved and new people came to office, the principal parties have changed sides: the United States initially wanted quotas and now opposes them; Chicago, which initially discriminated against blacks, Hispanics, and women, now adjusts exam scores and sponsors quotas in their favor. Today's disputes concern new examinations and practices. What the parties to this appeal are contesting is so far removed from the original point of this suit that it is in effect new litigation, yet encumbered with the barnacles of a generation.
 
 
 34
 The decree has served its office. It should be dissolved. If Chicago commits new wrongs, those aggrieved must prove it. Fresh litigation, on a fresh record, can proceed without the excess parties of this case or fear that failure to make some point in 1974 forfeits it in 1990. Law, not equitable discretion, will hold the balance. Until then, state and local law should govern the selection and promotion of police officers. Let us close the book on this old dispute and wish that the episode never be repeated.
 
 
 
 [1]
 Only the exams most recently administered by the City for the position of sergeant are the subject of this appeal. The long and complicated procedural history of the litigation as a whole, with its endless array of consolidated cases and intervenor actions, has been detailed in our previous decisions. The foregoing review of the litigation, rather lengthy in light of our disposition, is limited to those developments necessary to understanding the limited issue that was before the district court
 
 
 [2]
 The United States did not file a notice of appeal from the district court's November 21, 1988 order